**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALNYLAM PHARMACEUTICALS, INC.<br><br>Plaintiff,<br>v.<br><br>MODERNA, INC., MODERNATX, INC., and MODERNA US, INC.,<br><br>Defendants. | Civil Action No. 23-cv-580-CFC<br><br>[redacted] |

# **JOINT CLAIM CONSTRUCTION BRIEF**

# Table of Contents


I. INTRODUCTIONS ........ 1
  A. Alnylam's Introduction ........ 1
  B. Moderna's Introduction ........ 2
II. MODERNA'S FACTUAL BACKGROUND ........ 4
  A. Moderna Developed the Novel Ionizable Lipid SM-102 for the Delivery of mRNA ........ 4
  B. The '479 Patent Family Resulted from Alnylam's Work on a Completely Different Type of Therapy ........ 5
  C. The '479 Patent ........ 6
III. DISPUTED CONSTRUCTIONS ........ 10
  A. "head group" ........ 10
    1. Alnylam's Opening Position ........ 11
    2. Moderna's Answering Position ........ 15
    3. Alnylam's Reply Position ........ 21
    4. Moderna's Sur-Reply Position ........ 27
  B. "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$" ........ 31
    1. Alnylam's Opening Position ........ 31
    2. Moderna's Answering Position ........ 47
    3. Alnylam's Reply Position ........ 66
    4. Moderna's Sur-Reply Position ........ 82
  C. "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4" ........ 88
    1. Alnylam's Opening Position ........ 88
    2. Moderna's Answering Position ........ 94
    3. Alnylam's Reply Position ........ 102
    4. Moderna's Sur-Reply Position ........ 106

# Table of Authorities

**Page(s)**

**Cases**

*Adasa Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ....................25, 29

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
182 F.App'x 994 (Fed. Cir. 2006) ....................54, 74, 85

*Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*,
808 F.3d 1313 (Fed. Cir. 2015) ....................38, 77, 78, 87

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ....................38, 77, 78, 87

*Aspex Eyewear, Inc. v. Marchon Eyewerar, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012) ....................96, 103

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
359 F.3d 1367 (Fed. Cir. 2004) ....................54, 74, 85

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020) ....................32, 47, 73

*Bioverativ Inc. v. CSL Behring LLC*,
2019 WL 1276030 (D. Del. Mar. 20, 2019) ....................54, 85

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ....................29

*Clare v. Chrysler Grp., LLC*,
819 F.3d 1323 (Fed. Cir. 2016) ....................85

*Cordis Corp. v. Medtronic AVE, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003) ....................91

*Eon Corp. IP Holdings LLC v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) ....................66

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) ....................25, 29

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ....................................................................32, 37

*Grober v. Mako Prods., Inc.*,
686 F.3d 1335 (Fed. Cir. 2012) ...............................................................65, 81, 87

*HBAC Matchmaker Media, Inc. v. Google Inc.*,
650 F. App'x 990 (Fed. Cir. 2016)..........................................................................28

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008) ....................................................................31, 35

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ....................................................................73, 91

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
175 F. 3d 985 (Fed. Cir. 1999) .............................................................................89

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ................................................................35, 73, 98

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................................................................32, 37

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005) ....................................................................14, 24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008) ...........................................................82, 102, 106

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................*passim*

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016) ..............................................................................86

*Renishaw PLC v. Marposs Societa'per Azioni*,
*158 F.3d 1243 (Fed. Cir. 1998))* ..........................................................................11

*SanDisk Corp. v. Kingston Tech. Co.*,
695 F.3d 1348 (Fed. Cir. 2012) ............................................................................93

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ....................................................................81

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) ...........................................................65, 109

*Shire LLC v. Abhai, LLC*,
219 F.Supp.3d 241 (D. Mass. 2016).........................................................54

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
753 F.3d 1291 (Fed. Cir. 2014) ................................................................89

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ................................................................23

*Terlep v. Brinkmann Corp.*,
418 F.3d 1379 (Fed. Cir. 2005) ................................................................94

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)...................................................................................104

*Thorner v. Sony Computer Ent'mt Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..........................................................67, 73

*Trustees of Bos. Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018) ................................................................94

*Vederi, LLC v. Google, Inc.*,
744 F.3d 1376 (Fed. Cir. 2014) ..............................................95, 102, 103

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ..............................................95, 103, 107

# I. INTRODUCTIONS

## A. Alnylam's Introduction

Alnylam is a recognized pioneer in the development of RNA therapeutics and RNA delivery technology. More than a decade before the COVID pandemic, Alnylam began developing its critical lipid particle delivery technology for the safe and effective transport of delicate RNA materials to human cells. Alnylam utilized this novel technology to deliver the world's first approved RNAi therapeutic, ONPATTRO® (patisiran), which it launched in 2018.[1] ONPATTRO® is currently approved for the treatment of polyneuropathy (a nervous system disorder) caused by an illness called hereditary ATTR amyloidosis. Additionally, Alnylam has filed an Investigational New Drug Application for ALN-BCAT, which employs Alnylam's lipid particle technology for delivery of an RNAi therapeutic targeting β-catenin for the treatment of hepatocellular carcinoma. Ex. 9. (IND for ALN-BCAT).

The promise of nucleic acids as therapeutics was recognized long ago, but the ability to safely and effectively deliver nucleic acids remained elusive. The core ground-breaking innovation of the Patent-in-Suit is a class of improved lipids with protonatable groups (also called cationic lipids). Alnylam's new class of lipids,

[1] Alnylam also developed another method of delivering RNA, termed GalNAc Delivery, which is utilized in four FDA approved products, GIVLAARI® (givosiran), approved in 2019, and OXLUMO® (lumasiran), approved in 2020, and AMVUTTRA® (vutrisiran), approved in 2022, and LEQVIO® (inclisiran), approved in 2021. LEQVIO® is licensed to Novartis.

when formulated into lipid particles, effectively protects and delivers nucleic acid payloads to their biological targets. The lipids then biodegrade to aid in elimination from the body.

Before the Court for claim construction are terms from Alnylam's '479 Patent ("Patent-in-Suit", Ex. 1), all of which were identified by Moderna: (1) "head group;" (2) "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$;" and (3) "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4." A person of ordinary skill in the art ("POSA") would readily understand these terms. Consequently, as Alnylam proposes, there is no reason for the Court to deviate from their ordinary and customary meanings. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("Because the patentee is required to define precisely what his invention is . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.") (quotation marks omitted). In contrast, Moderna seeks to use claim construction to read in limitations not present in the claim language. This does not comport with either the law or the scientific understanding of a POSA upon reading the intrinsic record.

### B. Moderna's Introduction

This case involves the fifth Alnylam patent asserted against Moderna's lifesaving COVID-19 vaccine, SPIKEVAX®. Despite its persistence, Alnylam

contributed nothing to Moderna's vaccine. Alnylam did not invent Moderna's foundational mRNA technology, the vehicle that delivers it, nor Moderna's proprietary cationic lipid, SM-102. In fact, Alnylam never worked on an mRNA therapy at all, as evidenced by the very different RNAi therapies touted in its introduction. What Alnylam did was dust off an almost decade-old patent application and unsuccessfully try to ensnare SM-102 based on its public disclosure.

The claims of the '479 patent, like the four previous patents that Alnylam was forced to take judgment on, are stretched far beyond anything within the patent's four corners. The patent discloses lipids very different than SM-102 and attempts to mask that deficiency through claims that, very atypically, describe chemical compounds in words, not with structures. Now, unhappy with its own choice of words, Alnylam seeks overly broad constructions that depart from the claims' plain language, the ordinary meaning in the field, and the examples in the written description, in an attempt to create infringement where there is none.

Moderna's constructions, in contrast, align with the plain and ordinary use of the terms when read in context of claim language and the written description. That those constructions also result in SM-102 not infringing should be of no surprise given that Alnylam had nothing to do with Moderna's revolutionary technology.

## II. MODERNA'S FACTUAL BACKGROUND

Moderna recognizes that the Court already has much of the scientific background needed to construe the disputed claim terms from the parties' briefing and the claim construction hearing in *Alnylam Pharms., Inc. v. Moderna, Inc., et al.*, 1:22-cv-00335-CFC ("the -335 case"). Moderna thus provides a brief factual overview but does not repeat all the relevant facts.

### A. Moderna Developed the Novel Ionizable Lipid SM-102 for the Delivery of mRNA

Founded in 2010, Moderna's mission was to make mRNA-based medicines a reality. (Ex.30.) The operating concept was to use messenger RNA ("mRNA") to instruct cells to make proteins with a therapeutic benefit, including for use in vaccines. (*Id.*) One major hurdle in developing mRNA-based medicines was transporting the mRNA safely through the body and into cells. (Ex.31, 2-4; Ex.32, 2.) Moderna investigated many different technologies to overcome this delivery hurdle, settling on "lipid nanoparticles" ("LNPs"). (Ex.33; Ex.32, 6; Ex.34, 3-4; C.A. No. 22-335, D.I. 87, 2-3.)

Moderna spent year developing LNPs tailored to work with mRNA. (Ex.33; Ex.34.) As part of its work, Moderna conducted extensive research to discover a suitable cationic lipid, resulting in the novel cationic lipid SM-102.[2] (Ex. 36, 8;

[2] Moderna holds issued U.S. patents covering SM-102. (*See, e.g.,* Ex.53.)

Ex.32, 6-7; Ex.34, 3-4.) LNPs including SM-102 proved capable of successfully delivering mRNA to cells. (Ex.32, 7.) In response to the COVID-19 pandemic, Moderna leveraged its proprietary LNP and mRNA technology, including SM-102, to develop its lifesaving vaccine, SPIKEVAX®, in record time. (Ex.33, 8-9; Ex.37, 11; Ex.38; Ex.34, 3-4; Ex.39, 10.)

### B. The '479 Patent Family Resulted from Alnylam's Work on a Completely Different Type of Therapy

Unlike Moderna, Alnylam focused on therapies using siRNA, a different type of RNA. (Ex.32, 4.) mRNA is hundreds of times larger than siRNA and, as a result, much harder to package into drug delivery vehicles, like LNPs. (Ex.31, 3-5; Ex.32, 6.) Alnylam never developed a cationic lipid capable of achieving the more difficult goal of mRNA delivery, much less an FDA-approved mRNA product.

In 2012, in conjunction with its work on siRNA delivery, Alnylam filed the first non-provisional application in the '479 patent family. ('479 patent; Ex.41.) Alnylam's application disclosed lipids that are quite different than SM-102. (*See* Ex.41.) Over the next eight years, Alnylam prosecuted only three applications in the patent family, resulting in three issued patents. ('479 patent, 1:4-15; Ex.42.) Alnylam has not sued Moderna on any of those patents, which do not include any claim that would arguably cover SM-102. (*See* Ex. 42; Ex.43; Ex.44.)

In 2021, Alnylam abruptly changed course. After the structure of SM-102 became public, and Moderna received Emergency Use Authorization for

SPIKEVAX®, Alnylam suddenly filed a series of applications in an apparent effort to cobble together claims that might cover SM-102. (Ex.41.) Despite its silence during nearly a decade of previous prosecution, Alnylam now claimed that it, not Moderna, invented SM-102 and Moderna's LNP technology used in SPIKEVAX®.

Alnylam has now sued Moderna on five patents obtained since 2022.[3] In the –335 case, Alnylam stipulated to non-infringement of two of those patents shortly after this Court issued an order construing the term "branched alkyl." (C.A. No. 22-335, D.I. 125, D.I. 126.) In this case, Alnylam originally asserted three patents but agreed to dismiss two of them after the Court's claim construction ruling in the -335 case. (D.I. 36.) The remaining patent at issue is the '479 patent.

### C. The '479 Patent

The '479 patent resulted from an application filed on February 14, 2022 and issued on April 25, 2023. ('479 patent.) Its written description is substantively identical to the asserted patents in the -335 case (*see* '479 patent; C.A. No. 22-335, D.I. 95-1, D.I. 95-2) and generally discloses cationic lipids that include a head group, central moiety and two hydrophobic tails. ('479 patent, Abstract.) The hydrophobic tails include one or more "biodegradable groups," such as esters. (*Id.*)

---

[3] Alnylam has filed a total of ***fifteen*** new applications in the patent family since 2021, including five new applications in the last six months. (Ex.41.)

**Head Group.** The written description spans 500 columns, including ten generic formulas of the invention, hundreds of exemplary head groups, thousands of exemplary lipid structures, and twenty synthetic schemes to make the disclosed lipids. (*Id.*, 1:1-500:67.) In every single one of those examples, the "head group" includes a protonatable or permanently positively charged group. (*Id.*) Moreover, the written description only discusses the protonatability (or pKa) of the head group, not any other part of the lipid. (*Id.*, 32:17-35.)

**Alkyl Group That is Branched.** The claims require that one hydrophobic tail includes an "alkyl group that is branched." The plain and ordinary meaning of that phrase, when taking into consideration the patent's definition for the term "alkyl," requires a carbon atom that is bound to at least three other carbon atoms, or put another way, a tertiary or quaternary carbon.

The patent defines "alkyl" to "refer to a straight or ***branched chain saturated hydrocarbon moiety***." ('479 patent, 376:14-22.[4]) The parties agree that express definition applies to the term "alkyl group that is branched" (*infra*, III.B.2.a.), and the Court has previously concluded that the definition of "alkyl" was "clear and unmistakable lexicography." (C.A. No. 22-335, D.I. 125.)

[4] All emphasis added unless otherwise noted.

The patent's definition of "alkyl" uses well-known, common chemistry terms.[5] A "hydrocarbon" is a molecule made up ***entirely*** of carbon and hydrogen atoms. (Ex.51, 82; Ex.45, ⁋26.) A "saturated" hydrocarbon has only single bonds between carbons (as opposed to double or triple bonds) and thus is "saturated" with the maximum possible number of hydrogens per carbon. (Ex.51; Ex.45, ⁋30.) Some exemplary saturated hydrocarbons are depicted below:



Methane Ethane Propane Butane

(Ex.51, 82; Ex.45, ⁋30.) Importantly, as shown above, and as the experts agree, each carbon in a saturated hydrocarbon is bound to ***four other atoms***, each of which is either a carbon or a hydrogen. (Ex.51, 82; Ex.45, ⁋30; Ex.3, ¶16.)

The "alkyl" definition also requires that the saturated hydrocarbon is either a "straight or branched chain." ('479 patent, 376:14-22.) A "branched chain" hydrocarbon must include at least one carbon atom connected to three or four other carbons, thus forming a branch. (Ex.45, ⁋33; Ex.45D, 21; Ex.45E, 87-88; Ex.51, 83; Ex.45F, 269; Ex.45C, 4; Ex.45G.) Chemists commonly call carbon atoms bound to three or four other carbons terms "tertiary" and "quaternary" carbons, respectively.

---

[5] The word "moiety" simply refers to a chemical group within a larger molecule. (Ex.45, ⁋62.)

(Ex.51, 87-88; Ex.45, ⁋32.) Other carbons are referred to as "primary" (carbon bound to one other carbon) and "secondary" (carbon bound to two other carbons). (Ex.51, 88; Ex.45, ⁋32.) As a result, a branched hydrocarbon must include a tertiary or quaternary carbon. (Ex.45, ⁋33-34.)

Examples in the written description show why a hydrocarbon must include a tertiary or quaternary carbon to be "branched." For instance, in the alkyl group below, which the patent calls "branched," the carbon highlighted in yellow is bound to three other carbons (highlighted in blue) and forms a branching point:



('479 patent, 55:21-23, 55:58-67 (annotated); Ex.45, ⁋36, 64.)[6] In contrast, the next alkyl group, which all parties would agree is "straight," does not have a branch because it includes a primary carbon (shown in green) and secondary carbons (shown in blue), but no tertiary or quaternary carbons:

[6] In this style of chemical structure, each line represents a bond, each corner where lines connect represents a carbon atom, and hydrogen atoms are not shown. (Ex.45, ⁋28-29.) Thus, this structure represents the carbon atom in yellow bound to three other carbons atoms and a hydrogen atom, which is not shown.



('479 patent, 74:8-12 (annotated); Ex.45, ⁋35, 65.)

Consistent with this plain meaning, the patent defines the synonymous term "branched alkyl" as follows:

> Unless otherwise specified, the terms ***"branched alkyl"***, "branched alkenyl", and "branched alkynyl" ***refer to an alkyl***, alkenyl, or alkynyl ***group in which one carbon atom in the group (1) is bound to at least three other carbon atoms*** and (2) is not a ring atom of a cyclic group.

('479 patent, 376:41-47.) The patent's definition of "branched alkyl" requires a tertiary or quaternary carbon ("carbon atom . . . bound to at least three other carbon atoms"), just like the plain meaning of "alkyl group that is branched." (Ex.45, ⁋61-71.) In the -335 case, the Court found this definition was "clear and unmistakable" lexicography. (C.A. No. 22-335, D.I. 125.)

## III. DISPUTED CONSTRUCTIONS

### A. "head group"

| Term | Alnylam's Construction | Moderna's Construction |
|---|---|---|
| Head group | Plain and ordinary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails" | "a group that may be protonated" |

### 1. Alnylam's Opening Position

The term "head group" should be afforded its ordinary and customary meaning, which is "a portion of the lipid molecule that is less hydrophobic than the hydrophobic tails." Moderna's attempt to artificially limit the head group term to require protonatability is wrong as a matter of law and does not comport with how a POSA would understand the term as of the priority date in light of the specification.[7] As such, Moderna's proposed construction should be rejected. *Phillips,* 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)) ("'The construction that stays true to the claim language and most naturally aligns with the Patent's description of the invention will be, in the end, the correct construction.'").

#### a. The Claim Language Does Not Support Moderna's Proposed Construction

At the outset, nothing in the claim language itself suggests that the head group must be "protonatable." The Patent-in-Suit's independent Claims 1 and 13 simply

[7] As discussed in detail below and in the Declaration of Alexander Kros, PhD ("Kros Decl.") (Ex. 2), it is improper to read in any limitation of protonatability into the term "head group." However, to the extent that the Court engages in this analysis, it must do so in the context of what these lipid compounds are used for – namely, the formulation of lipid particles for the delivery of nucleic acids. As such, there are certain groups that could be protonated at some pH, but that would not function as the protonatable group in such a lipid. To the extent that Alnylam understands Moderna's proposed construction, Moderna appears to be requiring the head group to be the site of protonation for the lipid compound molecule as a whole.

require that the claimed "lipid compound," which comprises "a head group, two hydrophobic tails, and a central moiety," be protonatable. There is nothing in the claims requiring that the head group be the portion of the lipid compound that is protonatable. '479 Patent, Claims 1, 13 ("wherein the *lipid compound* contains a protonatable group").

The claims also expressly require that the central moiety be a nitrogen, which a POSA understands is a protonatable group. Kros Decl., ¶48. With a protonatable group in the central moiety, there is no need or requirement for a protonatable group in the head group. Kros Decl., ¶¶47-49. The context of the term "head group," juxtaposed against the remainder of the claim language, which only requires there be a "protonatable group" in the lipid compound and not in any specific location,[8] confirms the error of Defendants' proposed construction that the term "head group" be limited to "a group that may be protonated." *Philips*, 415 F.3d at 1314 (context of the claim is highly instructive).

**b. The Written Description Supports Alnylam's Construction and Does not Support Moderna's Construction**

The written description supports Alnylam's proposed construction. A POSA reading the Patent-in-Suit understands that it discloses examples of lipids with

---

[8] A POSA would understands that the protonatable group could not be in the hydrophobic tails because it would make them not hydrophobic. Kros Decl., ¶¶45-46.

hydrophobic tails with less hydrophobic head groups. A POSA would be aware of the general structure of lipids with hydrophobic/less-hydrophobic regions. A POSA understands from the written description that the claimed lipids have this same basic structure. Kros Decl., ¶¶29-40; *see e.g.*, '479 Patent, 37:1-38:20, Table 3. The lipid compounds are required to have such hydrophobic/less-hydrophobic characteristics to form the "lipid particle" that carries the nucleic acid. Claim 13; Kros Decl., ¶¶37-40.

The written description confirms the error of Moderna's construction. At column 16, for example, the written description describes a "protonatable group" – the language of the claims – in the context of a "primary group" encompassing both the head group and the central moiety. '479 Patent, 16:43-53. Nothing about this language requires the protonatable group to be in the head group. Instead, it plainly shows that the protonatable group could be either in the central moiety or the head group. This contradicts Moderna's proposed construction.

The text then specifies that the central moiety can be a nitrogen atom, which a POSA understands may be protonatable. '479 Patent, 16:43-60; *see* Kros Decl., ¶52. Similar language is found in column 32. '479 Patent, 32:36-37, Kros Decl., ¶¶54-57. By teaching that the central moiety can be a nitrogen, column 16 teaches a POSA that the head group need not contain a protonatable group. *See* Kros Decl., ¶¶50-53.

### c. The Extrinsic Record Supports Alnylam's Construction and Does not Support Moderna's Construction

As an initial matter, Alnylam does not believe it is necessary to reach the extrinsic record for the purpose of claim construction, as the proper construction of "head group" is clear from the intrinsic record. However, to the extent that the Court turns to extrinsic evidence, it confirms that Alnylam's construction is consistent with the prior art. *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005). First, standard texts show that the principal feature of a lipid head group is its ability to interact with water, which is necessary for the lipid particles of the claim to form. Claim 13; Kros Decl., ¶¶18-19; *see also* Ex. 16 (Britannica), Ex. 17, (Molecular Biology of the Cell) at 58-59, Ex. 18, (Dictionary of Science) at 460. This supports Alnylam's construction that the head group is the less hydrophobic portion of the molecule.

Second, in the specific field of drug delivery, those working to develop delivery mechanisms had understood for many years that, while lipids with protonatable groups are necessary to form lipid particles for delivery of nucleic acids, the protonatable groups can be located either in what the Patent-in-Suit calls the head group or in the central moiety. Kros Decl., ¶¶ 58-74; *See also* Exs. 20 (Srilakshmi), 21 (Martin), 22 (Anderson 2006), 23 (Anderson 2008), and 24 (Whitehead). As Dr. Kros details, beginning as early as 2002, and continuing to

today, many different groups synthesized cationic lipids with protonatable groups in what the Patent specifies to be the central moiety position and non-protonatable groups in what the Patent calls the head group. *Id.* This is consistent with Alnylam's proposed construction and shows that Moderna's limited construction is not supported by the art.

### 2. Moderna's Answering Position

Moderna's proposed construction of "head group" is consistent with the claim language and compelled by the written description, which mandates that the head group include a protonatable group. The extrinsic evidence likewise shows that skilled artisans at the time understood that the "head group" of a cationic lipid must be protonatable. Alnylam does not point to any contrary evidence.

Alnylam construction is overbroad and unhelpful. Alnylam argues that the plain meaning of "head group" requires it be "less hydrophobic" than the hydrophobic tails, but its plain meaning evidence relates solely to naturally occurring lipids, not the claimed cationic lipids. Alnylam's construction also fails to distinguish the "head group" from other parts of the claimed lipid because any portion of the lipid would be less hydrophobic than the hydrophobic tails. Alnylam's construction should be rejected, and Moderna's construction adopted.

#### a. The Intrinsic and Extrinsic Evidence Support Moderna's Construction

The claimed lipid compound must have at least three parts – a head group, a central moiety, and two hydrophobic tails – and include a "protonatable group." ('479 patent, 503:2-20.)

A skilled artisan would have understood that "head group" referred to the part of the lipid that included a protonatable group. (*See, e.g.,* Ex.46 ("[a]ll cationic lipid molecules contain three functional groups," including "a positive charged head group."); Ex.47 ("[c]ationic lipids . . . all share three structural features," including "a positively charged head group."); Ex.50, 150:11-160:4, 164:12-168:10; 177:3-8; Ex.48, ALNY-00946770; Ex.49, ALNY-00954963.)

Consistent with the plain meaning at the time, the written description demands a protonatable head group. Every exemplary cationic lipid head group in the written description is protonatable, consistent with Moderna's construction, including:

- All ten generic chemical formulas of the invention. ('479 patent, 2:15-16:18:41.)
- Over 100 head exemplary head group structures. (*Id*., 37:30-42:50, 61:39-67:25.)
- Over 1000 exemplary lipids, spanning nearly 300 columns of the patent. (*Id*., 75:3-370:44.)
- Every lipid resulting from the patent's twenty synthetic schemes. (*Id*., 399:40-458:55.)
- Each lipid tested in the patent. (*Id*., 488:54-499:54.)

(*See also*, Ex.50, 127:5-11; 171:5-17, 175:25-177:8.) Alnylam, in fact, conceded in the Pfizer case that the patent does not include a single embodiment with a non-protonatable head group. (Ex.50, 21:13-24:11.)

The written description also uses the term "head group" consistent with Moderna's construction. ('479 patent, 37:3-19, 61:4-29.) As shown below, the patent includes two illustrations that identify the different portions of an exemplary lipid. (*Id.*) Each identifies ***different portions of the exact same lipid*** as the "head group":






(*Id.*) But both images have one very important thing in common: the "head group" includes the lipid's protonatable group.

The written description also includes a paragraph in Column 32 that identifies numerous suitable head groups, all of which are protonatable. ('479 patent, 32:17-35.) All the examples of amine-containing head groups are protonatable. (Ex.50, 171:5-17.) The examples of "less strongly basic" functional groups relied upon by Alnylam, *i.e.*, pyridine, imidazole, and guanidinium, are also protonatable under relevant conditions. (Ex.50, 124:10-25, 175:4-14.) And "zwitterionic" head groups, by definition, have at least one protonatable group, consistent with Moderna's construction.[9] (Ex.50, 115:12-116:13, 126:10-21, 173:2-174:10, 175:15-24.)

Finally, the written description only discusses the protonatability of the head group, not the central moiety or any other portion of the lipid. The patent explains that the "head group can include an amine; for an example an amine ***having a desired*** ***$pK_a$*****.**"[10] ('479 patent, 32:56-57.) Alnylam's expert admitted that the "pKa determines the pH at which the amine is protonated" and that the "inventors are explaining that a desired pKa for an amine is an important feature of the head group." (Ex.50,

---

[9] The passage "other head groups are suitable as well" does not teach non-protonatable head groups. As Pfizer's experts concedes, the patent never states that uncharged head groups are "suitable." (Ex.50, 127:5-11.)

[10] pKa is the approximate pH at which the predominant species of a protonatable molecule become positively charged. (Ex.39, 18.)

114:11-17.) He also conceded that "the specification never talks about the pKa of a nitrogen in a central moiety." (*Id.*, 115:9-11.)

In sum, the intrinsic evidence ***only*** discloses head groups that are protonatable, consistent with the ordinary meaning at the time, and Moderna's construction.

### b. Alnylam Does Not Cite Any Evidence That Contradicts Moderna's Construction

Nothing in the claim language, written description or extrinsic evidence undercuts Moderna's construction.

**Claim Language.** Alnylam is wrong that the claim language discloses the central moiety as the site for protonation. Its own expert admitted that the claim language only describes the central moiety as a physical linker between the head group and the hydrophobic tails. (Ex.50, 94:15-24.) And one of the two examples in the patent where the central moiety is a nitrogen is an amide group, which is not protonatable. (Ex.35, A-15, 1059; Ex.6, 6.) But, critically, even if the central moiety is protonatable, Alnylam is wrong that "there is no need or requirement for a protonatable group in the head group." (*Supra*, III.A.1.a.) Indeed, both examples in the patent where the central moiety is a nitrogen ***also include*** a protonatable nitrogen in the head group. ('479 patent, 18:7-23; Ex.50, 105:10-106:10.)

**Written Description.** The written description's discussion of "primary groups," relied on by Alnylam, does not teach non-protonatable head groups. (*Supra*, III.A.1.b; '479 patent, 16:53-60.) Instead, that portion of the written description

merely provides that the "primary group" includes a head group and a central moiety and also comprises a protonatable group. ('479 patent, 16:53-60.) Alnylam reads that passage to allow for a protonatable group in the central moiety, but the actual language does not say that, much less suggest that the head group ***is not protonatable***. (*See* Ex.50, 104:23-105:6; 105:10-106:10.) Rather, when read in the full context of the written description, a skilled artisan would read Colum 16 to teach a "protonatable group" in the head group portion of the primary group. (Ex.50, 177:18-179:6.)

The written description's statement that "[r]epresentative central moieties" include "a central nitrogen atom" fares no better. Nothing in the patent suggests a nitrogen central moiety has any function beyond physically linking the head group and tails, much less that it can be the only protonatable group. (Ex.50, 178:14-179:6.) Regardless, even if the central nitrogen were protonatable, the only two examples of primary groups in the specification with a nitrogen atom central moiety also have protonatable head groups. ('479 patent, 18:7-23; Ex.50, 105:10-106:10).

**Extrinsic Evidence.** Alnylam does not identify a single instance where the prior art uses the term "head group," in the context of cationic lipids, to refer to non-protonatable structures. Several references discuss only naturally occurring lipids, like phospholipids, and thus have little relevance to the cationic lipids at issue here. (Exs.16, 17, 18; Ex.50, 55:7-57:16.) For those that actually relate to cationic lipids,

several do not use the term "head group" at all and are not relevant to the meaning of the term. (Exs.22, 23, 24.) Those that do use "head group" ***always*** use the term to reference a protonatable portion of a cationic lipid. (*See* Ex.21 ("A cationic lipid is a positively charged amphiphile, which generally contains the three following structural domains: i) a hydrophilic headgroup ***which is positively charged***…"); Ex.20 (showing head groups that include a nitrogen atom).)

Alnylam's extrinsic evidence is thus entirely consistent with Moderna's construction and, regardless, cannot overcome the overwhelming intrinsic evidence demonstrating that a "head group" must be protonatable.

#### c. Alnylam's Construction is Unsupported and Overbroad

Alnylam relies on a purported plain meaning based on the use of "head group" in naturally occurring lipids, like phospholipids, that have little relevance to the claimed cationic lipids. Alnylam's construction also fails to distinguish the head group from the other portions of the lipid because any portion of the lipid, including the central moiety, would be "less hydrophobic" than the tails. (Ex.50, 102:9-15; 92:20-93:21.)

### 3. Alnylam's Reply Position

Moderna misconstrues both the intrinsic and extrinsic evidence. Both the intrinsic and extrinsic evidence show that there is no requirement that a "head group" be protonatable. Further, Moderna's litigation-inspired claim construction for head

group should be rejected because it is ambiguous as to what pH range should be used to assess protonatability and is unsupported by the evidence.[11]

### a. The Intrinsic Evidence Supports Alnylam's Construction

Moderna misconstrues, or simply ignores, the intrinsic evidence that contradicts its construction. Moderna argues that the written description requires a protonatable head group. This is incorrect. Nothing in the written description limits the plain meaning of head group to require that the head group be protonatable.

Moderna's argument appears to be that the intrinsic evidence contains protonatable head groups, and therefore the head group must be protonatable. But this disregards other disclosures in the Patent-in-Suit. It is undisputed that the written description teaches that the "primary group" – the head group ***plus*** central moiety – contains the protonatable group. *See* '479 Patent, 16:42-60; Kros Decl., ¶¶50-53. Despite Moderna's arguments to the contrary, nothing in the discussion of primary groups in the Patent-in-Suit requires the site of protonation to be in the head

[11] Rather than offering its own expert to rebut Dr. Kros, Moderna instead inexplicably relies on testimony from Dr. Whitehead in another action, involving different patents in the same family, where Moderna is not a party, and importantly, where the parties' arguments there were rooted in the Court's construction of "cationic lipid," a term which does not appear in the in the claims of the '479 Patent. Dr. Whitehead does not appear to be retained by Moderna, was not offering opinions on the claims at issue here, and presumably has not weighed in on arguments made by Moderna here. Further, Alnylam will not be afforded an opportunity to cross-examine Dr. Whitehead regarding any arguments made by Moderna. Consequently, Dr. Whitehead's opinions are entitled to no weight here.

group. This is particularly true given that the written description teaches that the central moiety can be a nitrogen, which a POSA would understand to be protonatable – a fact that Moderna has provided no expert testimony of its own to rebut. Kros Decl., ¶52 n.8. Further, at Column 32, the written description describes both protonatable and non-protonatable head groups. Kros Decl., ¶¶54-57. Finally, Moderna's argument regarding zwitterionic head groups misses the mark – the overall net charge for a zwitterion is zero, and therefore it cannot be the source of positive charge in the lipid molecule. Kros Decl., ¶57.

It is irrelevant that the patent provides a number of structures with protonatable head groups.[12] Such disclosure does not necessitate a construction of "head group" that requires protonation. The only way to reach the incorrect conclusion Moderna seeks is to look solely at the pictures and ignore the text, which is incorrect as a matter of law.[13] *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). For example, Moderna cites two different figures in columns 37 and 61 in an attempt to support its overly narrow construction. Neither figure states nor in any way suggests that a head group must be protonatable.

---

[12] As discussed below, Alnylam disputes Moderna's treatment of pyridine as a protonatable head group. *See* §III.A.3.c.

[13] Moderna's suggestion that "Alnylam, in fact, conceded in the Pfizer case that the patent does not include a single embodiment with a nonprotonatable head group (Ex. 50, 21:13-24:11.)" is incorrect. The portion of the transcript cited by Moderna is testimony from Pfizer's expert Dr. Whitehead about secondary sources. It is wholly irrelevant to the Moderna argument.

Instead, these figures are just diagrams of an embodiment. Moderna provides no explanation as to why the Court should look at an embodiment to read in a limitation into the claim language. Further, nothing about any of the diagrams or other written description in any way contradicts Alnylam's construction, as the head group throughout the patent are less hydrophobic than the hydrophobic tails.

#### b. The Extrinsic Evidence Supports Alnylam's Construction

Alnylam does not believe it is necessary for the Court to consider extrinsic evidence, as the claims and intrinsic record support Alnylam's construction and do not support Moderna's construction. *See Nazomi Commc'ns*, 403 F.3d at 1369 (stating district court should only look to extrinsic evidence "if further guidance is needed"). To the extent the Court does look to extrinsic evidence, it further supports Alnylam's proposed construction, and does not, as Moderna suggests, require that the "head group" must be protonatable. Moderna Response at 15.

As Dr. Kros put forth in his declaration, the prior art teaches exactly what Moderna claims is absent – cationic lipids for the delivery of nucleic acids with positively charged or protonatable nitrogen central moieties (as used in the Patent-in-Suit) and head groups that are less hydrophobic than the tails. For example, Srilakshmi (2002) discloses permanently positively charged central moieties and head groups with hydroxyl groups. *See* Kros Decl., ¶¶59-60, Ex. 20 (Srilakshmi (2002)). Similarly, Martin (2005) teaches of a cationic lipid "amphiphile[s]" for the

delivery of nucleic acids with either permanently positively charged or protonatable nitrogen central moieties and hydroxyl head groups. *See* Kros Decl., ¶61, Ex. 21 (Martin). Further, Anderson and Anderson (2008) provide extensive disclosures, including data, on lipids where the site of protonation is the nitrogen in the central moiety, rather than the head group. *See* Kros Decl., ¶¶62-69; Ex. 22 (Anderson); Ex. 23 (Anderson (2008)). Finally, Dr. Whitehead, the expert retained by Pfizer/BioNTech in a separate matter and whose testimony is repeatedly cited by Moderna, published a paper in 2011 discussing lipids with protonatable central moieties. *See* Kros Decl., ¶70, Ex. 24 (Whitehead).

To the extent that Moderna's argument is based on the fact that the prior art uses slightly different terminology than the Patent-in-Suit, that is of no moment. The scope of the disclosure is what a POSA would understand, not some mechanical exercise of matching up words. *See Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 913 (Fed. Cir. 2022) ("The invention is not the language of the claim but the subject matter thereby defined.") (quoting *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001)); *see also In re Fritch*, 972 F.2d 1260, 1264 (Fed. Cir. 1992) ("It is well settled that a prior art reference is relevant for all that it teaches to those of ordinary skill in the art.").

Further, the extrinsic evidence that Moderna relies on does not support its overly narrow claim construction. As Dr. Kros explained, four of the references that

Moderna cites do not support Moderna's overly narrow construction. Kros Decl., ¶71. Regarding Tang (1999) and Chesnoy (2000), both predate the asserted claims by more than a decade and would not have informed a POSA of what "head group" meant in the context of the Patent-in-Suit. Kros Decl., ¶72; Ex. 25 (Tang 1999); Ex. 26 (Chesnoy (2000)). The other two references, Jayaraman (2012) and Semple (2010), are about specific subsets of cationic lipids. They do not describe all cationic lipids, as Moderna appears to suggest. Kros Decl., ¶¶73-74; Ex. 27 (Jayaraman (2012)); Ex. 28 (Semple (2010)). The final paper Moderna relies on, Ramierz-Gordillo, is not an authoritative treatise on cationic lipids – it is a single paper referencing then commercially available cationic lipids from a low impact-factor journal on "on *in vitro* biology in animals." Ex. 62.

### c. Moderna's Construction Is Ambiguous

Moderna's construction is inherently ambiguous – a fact that is clear from its briefing. A POSA would understand protonatability is a property that is governed by the pH of the solution a given compound is in. That means that a molecule that could be protonatable at very low pHs (*i.e.*, in highly acidic conditions) may not be protonatable at high pHs (*i.e.*, under more neutral or basic conditions). Despite that fact, Moderna's construction makes no mention of what pH range at which protonatability is to be assessed. However, its briefing suggests that there is some sort of implied pH that Moderna is relying on that is not disclosed. For example,

Moderna argues that "pyridine, imidazole, and guanidinium, are also protonatable *under relevant conditions*." Responsive Brief, 18 (emphasis added). Moderna's litigation-inspired argument appears to be that there are "relevant conditions" that are acidic enough to read in the examples in the written description, but that will presumably read out Moderna's product for the purposes of infringement.[14] To be clear, Moderna does not define "relevant conditions" in any way in its brief, nor is that a term of art.

#### 4. Moderna's Sur-Reply Position

The evidence shows that the plain meaning of "head group" refers to the cationic lipid portion that includes a protonatable group, and the written description discloses nothing different. Alnylam does not point to anything in reply that justifies its attempt to stretch "head group" beyond its plain meaning and the written description's disclosure to try to capture SM-102.

[14] As discussed by Dr. Kros, pyridine is not protonatable in the pH range necessary to function as the protonatable lipid in a lipid particle. *See* Kros Decl., ¶55. Moderna has offered no evidence that contradicts Dr. Kros's point, nor has Moderna addressed the disclosure of the head group groups that have no functional group other than pyridine. *See* Kros Decl., ¶55, n.9. It is unclear to Alnylam what Moderna's "relevant conditions" are as they cannot be the conditions necessary for a form a lipid particle. Further, to the extent that Moderna argues that head groups with pyridine must contain another nitrogen, it is incorrect. The specification clearly discloses head groups containing only pyridine without additional functionality at 64:10-28. *See* Kros Decl., ¶55, n.9.

**Plain Meaning.** Moderna previously cited multiple articles showing that skilled artisans used "head group" to refer to the cationic lipid portion with a protonatable group.[15] (*Supra*,16.) Alnylam does not dispute that Tang and Chesnoy show that skilled artisans used "head group" to refer to the protonatable portion but instead argues those references are too old. (Exs.46,48.) But Moderna's other evidence shows the plain meaning of "head group" had not changed by the priority date.[16] (Exs.28,47,49.)

Alnylam, in contrast, does not identify a single reference showing the plain meaning of "head group" in a cationic lipid. Instead, Alnylam points to prior art lipid structures and ***characterizes them*** as having "nitrogen central moieties" and non-protonatable "head groups," even though the references say no such thing. (*Supra*,24-25.) Alnylam does not dispute three references do not use the term "head group" at all. (Exs.22-24.) Nor does Alnylam dispute that the two references that use "head group" use it to refer to the lipid portion that ***includes*** the protonatable group, consistent with Moderna's construction. (Exs.20-21.)

---

[15] The Court can always consult such sources to determine ordinary meaning. *HBAC Matchmaker Media, Inc. v. Google Inc.*, 650 F. App'x 990, 992 (Fed. Cir. 2016) ("The ordinary meaning of a claim term may be determined by reviewing a variety of sources, including . . . dictionaries and treatises.")

[16] There is nothing "inexplicable" about Moderna relying on Dr. Whitehead's testimony before this Court in the Pfizer case. (*Supra*,22.) Alnylam does not identify any evidentiary reason or cite any case suggesting the Court should not consider Dr. Whitehead's sworn testimony on the exact same issues.

Alnylam concedes its cited references use "different terminology" (*surpa*,25) but nonetheless incorrectly argues they are relevant based on inapposite cases addressing anticipation and obviousness, not claim construction. *See Adasa*, 55 F.4th at 913; *Fritsch*, 972 F.2d at 1264. While a prior art reference need not use the same words to anticipate or render obvious, claim construction focuses on the meaning of the exact claim language. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[I]n accord with our settled practice ***we construe the claim as written***, not as the patentees wish they had written it.").

**Written Description.** Moderna's argument is not that "the intrinsic evidence contains protonatable head groups, and therefore the head group must be protonatable" (*supra*,22) but that the written description ***only*** describes protonatable head groups, confirming the proper construction.

Alnylam points to only three discrete portions of the 502-column written description that supposedly disclose a non-protonatable head group, but none do. First, Alnylam argues that the patent's "primary group" discussion does not "require" a protonatable head group. (*Supra*,22-23.) But Moderna never argued that it did. Instead, the "primary group" discussion is silent on the protonatable group location and would not change the skilled artisan's understanding that the "head group" must be protonatable based on plain meaning and the full intrinsic record.

Second, the written description does not inherently disclose a non-protonatable head group because it allows for a nitrogen central moiety. Critically, Alnylam does not dispute that the patents' only two nitrogen central moiety examples ***include a protonatable head group***. (*Supra*,20.)

Third, and finally, Alnylam incorrectly argues that Column 32 describes examples of non-protonatable head groups. (*Supra*,23.) But Alnylam does not dispute that a "zwitterion" includes a protonatable group, consistent with Moderna's construction. (*Supra*,23; Ex.50,175:15-24.) And Alnylam's expert admitted that a "pyridine" is protonatable. (Ex.50,124:19-20.) Moreover, all three pyridine head group examples show a positive charge:




(Ex.1,64:9-27 (annotated).) Contrary to its new position that these examples are non-protonatable, Alnylam previously admitted that "[a]ll of the drawn-out structures [in the written description] have a protonatable head group." (Ex.63,21:13-24:11.)

### B. "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$"

| Term | Alnylam's Construction | Moderna's Construction |
|---|---|---|
| $R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$ | Ordinary and customary meaning, which is "$R^{13}$ is an alkyl group that has 10 to 20 carbons and is branched at the carbon directly next to $M^1$" | "R13 is a saturated hydrocarbon moiety with 10 to 20 carbon atoms in which the carbon atom next to $M^1$ (1) is bound to at least three other carbon atoms, and (2) is not a ring atom of a cyclic group" |

#### 1. Alnylam's Opening Position

The phrase "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$" should be afforded its ordinary and customary meaning to a POSA, consistent with its use in the intrinsic record. That is what Alnylam seeks. In contrast, Moderna's proposed construction would improperly narrow the claims to require that "the carbon atom next to $M^1$ (1) is bound to *at least three* other carbon atoms." Moderna's construction improperly excludes branched groups where the α-carbon is connected to only two other carbons. Moderna's flawed construction is premised on purported lexicography from a definition of a different term—"branched alkyl"—that is not used in the Patent-in-Suit's claims.

To act as its own lexicographer, a "patentee must clearly express [the] *intent* in the written description" to "assign to a term a unique definition that is different from its ordinary and customary meaning." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008) (emphasis added). The standard

for lexicography is "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). This is because, for lexicography to dictate, "the statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). This requires consideration of the specification as a whole, read in a manner that renders the Patent internally consistent. *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001)).

Moderna's "bound to at least three other carbon atoms" construction, which rests on purported lexicography of "branched alkyl," fails these stringent standards: (i) the claim language does not employ the term "branched alkyl;" (ii) the written description, comprising words, figures and formulas, repeatedly and precisely depicts an alkyl group branching at the α-position and binding to at least *two* carbons (not at least three); and (iii) the prosecution history confirms the ordinary and customary meaning Alnylam advances. Scheidt Decl. ¶¶ 27-48.[17]

[17] "Scheidt Decl." refers to the Declaration of Karl Scheidt, Ph.D., submitted herewith as Ex. 3.

**a. Alnylam's Construction Is Consistent with the Full Scope Of The Claims**

The Patent-in-Suit's independent claims state that $R^{13}$ is an "alkyl group" that is "branched" at the carbon atom next to (α-position) $M^1$, which a POSA would understand can be bound to at least two other carbon atoms. The Claim states in relevant part:

> at least one of the hydrophobic tails has the formula —$R^{12}$-$M^1$-$R^{13}$, wherein:
> $R^{12}$ is a $C_4$-$C_{14}$ alkyl group,
> $M^1$ is an ester group, and
> *$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$*;

'479 Patent, Claim 1 (emphasis added), 13.

The claims specify and define the general formula of the hydrophobic tail as —$R^{12}$-$M^1$-$R^{13}$—, where $M^1$ is an ester group, which can be either —OC(O)— or —C(O)O—. Scheidt Decl., ¶30. $R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position next to the ester group. '479 Patent, 31:58-60. Alnylam's construction provides clarity for the claim terms "$C_{10}$-$C_{20}$" as being 10 to 20 carbons and "branched at the α-position relative to $M^1$" as being branched at a carbon atom "next to" $M^1$.

Using the line structure drawings POSAs employ, and where the ester is —C(O)O—, the language precisely describes to POSAs the following two carbon binding (aka a secondary carbon) structure:




Scheidt Decl., ¶30. This claim language specifically encompasses two carbon binding.

In 22-cv-335-CFC, D.I. 114 at 2 and D.I. 115 at 145:20-146:16, this Court held that in a related Patent the Patentee acted as its own lexicographer by defining the term "branched alkyl" and "branched $C_{10}$-$C_{20}$ alkyl" and concluded that under that definition the above two carbon structure was not a "branched alkyl." The Court's prior finding of lexicography and Moderna's proposed construction rest on the specification providing the following:

> Unless otherwise specified, the terms "branched alkyl", "branched alkenyl," and "branched alkynyl" refer to an alkyl, alkenyl, or alkynyl group in which one carbon atom in the group (1) is bound to at least three other carbon atoms and (2) is not a ring atom of a cyclic group.

’479 Patent, 376:41-45. But the Court’s previous finding of lexicography does not apply here because it was premised on the ’933 Patent’s different claim term “branched alkyl.” *Cf.* ’479 Patent, 376:41-47. The term “branched alkyl” does not appear in any claim of the Patent-in-Suit, which employs the distinct phrase “alkyl group that is branched.” “[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.” *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999); *Helmsderfer*, 527 F.3d at 1381 (“A patentee may … assign to *a term a unique definition* …; however, a patentee must clearly express that intent in the written description.”) (emphasis added). This fact alone demonstrates a lack of clear and unmistakable intent to redefine and limit the claims under lexicography’s exacting standards.

Buttressing this conclusion, the independent claim language uses the term “alkyl,” *i.e.*, “*alkyl* group that is branched at the α-position.” This is significant because the claim invokes the term “alkyl,” (and not “branched alkyl”) and evinces the intent to invoke the specification’s separate definition of “alkyl.” Scheidt Decl., ¶42. The Patent-in-Suit defines “alkyl” as “a straight or branched chain saturated hydrocarbon moiety” with no artificial limitations on the number of carbons that must be bound to the branched carbon consistent with a POSA’s understanding. ’479 Patent, 376:13-22; Scheidt Decl., ¶41.

The definition of "alkyl" goes on to state that such branched alkyl groups "include *isopropyl*, *sec-butyl*, isobutyl, tert-butyl, and isopentyl." *Id.* at 376:21-22 (emphases added). "Isopropyl" and "sec-butyl" are each branched alkyl groups where the branching occurs at a carbon connected to only two other carbons, as set forth below:




Scheidt Decl., ¶41; *see also* Ex. 5 (McMurry) at 82. [18] These alkyl groups precisely identify a carbon that is branched and binding to two other carbons, not three, contrary to Moderna's construction.

The dependent claims confirm the claims' ordinary and customary scope. Scheidt Decl., ¶¶31-32. Dependent Claims 6 and 16 provide a formula where $M^1$ is —C(O)O— (depicted below).

[18] Although not shown, above the depicted dashed line, the isopropyl and sec-butyl groups are bound to something else. For example, when bound to an oxygen atom and a hydrogen atom, the carbon at the * is bound to two other carbon atoms.




Claims 6 and 16 further require "where $R^{13}$ is branched at the α-position relative to the —C(O)O— group." That is, these dependent claims, by reciting that the ester group $M^1$ is —C(O)O—, meaning the branching occurs immediately next to the second oxygen in the —C(O)O— group, expressly specify $R^{13}$'s scope as encompassing a carbon directly bonded to two other carbons, an oxygen, and a hydrogen. Scheidt Decl., ¶32. The claims themselves show that Moderna's construction fails under lexicography's exacting standards. *GE Lighting Sols.*, 750 F.3d at 1309.

**b. The Written Description Supports Alnylam's Construction**

Viewed through the entire specification, the alleged lexicography of "branched alkyl" fails to provide "sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co.*, 395 F.3d at 1370.

The Patent's formulas, figures, and words are highly germane objective manifestations of the Patentee's intent to encompass alkyl groups branched at the α-

position relative to $M^1$ having a carbon that is bound to only two other carbons. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350, 1352 (Fed. Cir. 2010) (en banc) ("the description requirement does not demand any particular form of disclosure" but can be demonstrated by "structure, formula, chemical name, physical properties or other properties"); *Advanced Steel Recovery, LLC v. X-Body Equip., Inc*., 808 F.3d 1313, 1317-18 (Fed. Cir. 2015) (finding a patent's drawings supported a district court construction of a patent's claims requiring a certain structure).

The Patent's formulas specify "the cationic lipid of the present invention." '479 Patent, 16:1-2. Each of the Patent's Formulas with α-branching (Formulas I, II, and VIII) depicts an exemplary alkyl group that is branched at the α-position having a carbon bound to two other carbons plus a hydrogen atom. '479 Patent, 2:9-13, 3:66-4:3; *see also* '479 Patent, 2:15-22, 3:63-65, 4:4-13, 5:1-21; Scheidt Decl., ¶¶34-35. For example, Formula (II) depicts at the α-position the carbon binding to a hydrogen, and two carbons at $R^z$ and $Z^1$, and the 4th bond with $M^1$, which is an ester group in either orientation:




’479 Patent, 4:4-13 (annotated with $R^{13}$ in green, and numbers at each branched carbon). These formulas objectively specify (shown in green) an α-carbon branching and binding to two carbons (aka a secondary carbon). Scheidt Decl., ¶34.

Similarly, exemplary Compound 1 (below), disclosed *four times* in the specification, precisely specifies two carbons bound to the α-branched carbon in $R^{13}$. ’479 Patent, 34:24-37, 35-36, 37-38, 60:50-65.



*See, e.g.*, '479 Patent, 34:24-37 (annotated); Scheidt Decl., ¶43.[19]

Using this compound as an exemplary structure, the specification explains that this compound "can also be thought of as a combination of a headgroup, a linker moiety, and two hydrophobic chains as follows:




*Id.* at 61:1-3, cols. 61-62, lines 4-24 (annotated); *see also id.* at 36:50-37:19 (similarly depicting the same compound "as a combination of a headgroup, a central moiety, and two hydrophobic groups"). Scheidt Decl., ¶36.

Following this exemplary structure, the specification states "[t]he *present invention* includes compounds composed of *any combination* of the head, linker, hydrophobic chain I, and hydrophobic chain II groups listed [(in Tables 2A-2E)] below." *Id.* at 61:31-34 (emphases added); Scheidt Decl., ¶37.

---

[19] Compound 1 contains an alkenyl. As explained in the Patent-in-Suit, an "alkyl" differs from an "alkenyl" due to the alkenyl having one or more carbon-carbon double bonds, whereas the alkyl has only carbon-carbon single bonds. '479 Patent, 376:13-17, 376:23-25. For purposes of this example, that difference is immaterial.

Table 2D discloses "[r]epresentative biodegradable moieties I and/or Ia and combinations thereof" ($M^1$) of the "present invention" ('479 Patent, 61:31, 71:44-45) to include the —C(O)O— structure (reproduced below).




'479 Patent, 71:46-50; Scheidt Decl., ¶38.

Table 2E expressly calls out "representative hydrophobic chain" tail structures that follow the biodegradable moiety ($M^1$). That Table precisely discloses an $R^{13}$ tail structure that is branched at the α-position binding to two carbons:



’479 Patent, 74:31-37 (annotated above with numbers at two carbons in red); Scheidt Decl., ¶39; *see also* Ex. 5 (McMurry), 82 (showing structures for Me, Et and Pr).

A “combination” of the “present invention” (’479 Patent, 61:31-34) comprising the disclosed $R^{13}$ tail structure and the biodegradable moiety ($M^1$) specifies a branched alkyl secondary carbon group at the α-position bound to an oxygen (in $M^1$) and a hydrogen (not shown in accordance with standard convention):




’479 Patent, 71:42-50, 74:31-37 (annotated) (combining representative biodegradable moiety (i.e., $M^1$) from Table 2D with representative hydrophobic chain (i.e., $R^{13}$) from Table 2E); Scheidt Decl., ¶40.

Also as discussed above at § C.1.a., the definition of “alkyl” supports the lack of intent to limit the claims to a carbon “bound to at least three other carbon atoms” (*i.e.*, a tertiary carbon) because it contains descriptions of chemical groups where the

carbon is branched and directly bound to two other carbons. Scheidt Decl., ¶41. Collectively, the written description time and time again specifically identifies at least two carbon binding alkyl groups that are branched, contrary to any lexicography limiting the alpha branched structures to at least three carbon binding groups. Scheidt Decl., ¶¶ 33-42.

#### c. The Prosecution History Supports Alnylam's Construction

If the claims and written description were not enough (they are), the prosecution history makes clear that the claims include branching where a carbon is not bound to at least three other carbon atoms. Scheidt Decl., ¶43. During prosecution, the Patentee amended the claims to add the "branched at the α-position relative to $M^1$" limitation to Claims 1 and 13 (then pending Claims 20 and 33).

**AMENDMENTS TO THE CLAIMS**

1-19. (Canceled)

20. (Currently Amended) A lipid compound, comprising a head group, two hydrophobic tails, and a central moiety to which the head group and the two hydrophobic tails are directly bonded, wherein:

the central moiety is a nitrogen atom;

each of the two hydrophobic tails independently consists of an aliphatic group interrupted by an ester group; and

at least one of the hydrophobic tails has the formula $-R^{12}-M^{1}-R^{13}$, wherein:

$R^{12}$ is a $C_4$-$C_{14}$ alkyl group,

$M^1$ is ~~a biodegradable group~~ an ester group, and

$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$;

the chain length of formula $-R^{12}-M^{1}-R^{13}$ is from 17 to 24 atoms;

~~in each hydrophobic tail, the biodegradable group is separated from a terminus of the hydrophobic tail $R^{13}$ by from 8 to 12 carbon atoms; and~~

~~in at least one hydrophobic tail, $R^{13}$ is branched, where the branching occurs at the α-position relative to the biodegradable group, and where~~ the total carbon atom content of the at least one hydrophobic tail is 21 to 26 carbon atoms; and

wherein the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below pH 7.4.

21. (Canceled)

22. (Currently Amended) The lipid compound of claim [[20]] 24, wherein the head group ~~comprises an~~ consists of a saturated aliphatic group and a hydroxyl group

2

135399.03524/129173518v.5

Ex. 7 (October 20, 2022 Applicants' Amendments to the Claims) at 2; *see also id.* at 4); Scheidt Decl. ¶44. The Examiner rejected the claims as anticipated by Manoharan. The Examiner cited, *inter alia*, the two compounds reproduced below:







Ex. 7 (October 20, 2022 Applicants' Remarks) at 9-10 (annotated with red boxes). Both compounds include tails with an ester, —C(O)O—, where the carbon branched at the α-position relative to the ester is bound to two other carbons, an oxygen, and a hydrogen (not shown) (as shown at the point of the annotations above). Scheidt Decl., ¶¶ 43-45.

In response, the Patentee distinguished the claims based on the central moiety—not that the branching depicted was not within the claim scope. Ex. 7 (October 20, 2022 Applicants' Remarks) at 10; Scheidt Decl., ¶48. The prosecution history provides objective notice that the claims are not limited to branching at a carbon bound three other carbons and were not being redefined through lexicography. *See Phillips*, 415 F.3d at 1317 (invention construed also with "reference to the file wrapper or prosecution history in the Patent Office."); Scheidt Decl., ¶ 47.

By any measure, Moderna's attempt to invoke lexicography under its exacting standards fails in view of this rich intrinsic record. Alnylam's construction should be adopted.

**d. The Written Description Specifies Two Carbon Binding in the Context of an Alkyl that Is Branched at the α-Position**

To the extent the Court disagrees, and applies the definition of "branched alkyl," it should apply the entire definition. That definition includes the words "unless otherwise specified." As discussed above, the application and the claims do specify otherwise. Indeed,

(i) the claim language, including dependent claims, with the ester "—C(O)O—",

(ii) the specification Formulas precisely showing α-branching to two carbons,

(iii) the multiple specification drawings precisely showing α-branching to two carbons,

(iv) the "present invention" components combined precisely showing α-branching to two carbons,

(v) the separate definition of "alkyl" identifying groups with a carbon binding to two carbons, and

(vi) the prosecution history

*all specify in the context of* α*-branching that the branched carbon may bind to just two carbons, an oxygen in* $M^1$, *and a hydrogen*. Scheidt Decl., ¶¶27-48; *Baxalta*, 972 F.3d at 1349 (in the context of a potentially definitional statement, "claim construction requires that we 'consider the specification as a whole, and [ ] read all portions of the written description, if possible, in a manner that renders the patent internally consistent.'") (quoting *Budde*, 250 F.3d at 1379-80).

**2. Moderna's Answering Position**

Unhappy with this Court's interpretation of "branched alkyl" in the -335 case, Alnylam now seeks a different result with the term "an alkyl group that is

branched."[20] Alnylam's new term simply rearranges the words "branched" and "alkyl," equivalent to changing "blue sky" to "sky that is blue." Alnylam argues that this reformulated claim language must have a different meaning than "branched alkyl," but unsurprisingly given the similarity in the terms, the result is the same. The plain and ordinary meaning of "alkyl group that is branched," read in light of the patents' express definitions, requires a carbon atom bound to at least three other carbons, just like the Court's construction in the -335 case. That interpretation is buttressed by the claim language and the written description's examples.

Alnylam does not point to anything that undercuts Moderna's construction. As it did in the -335 case, Alnylam incorrectly argues that the claim language "specifies" a secondary carbon at the α-position but again ignores that the fourth bond on the α-carbon can be either hydrogen or carbon. If it is carbon, the α-carbon is tertiary, and the alkyl is branched, consistent with Moderna's construction. As to the written description, Alnylam points to examples that have a secondary carbon at the α-position, but the patent does not describe them as "branched," much less show they depict an "alkyl that is branched." Every single example referred to as

[20] Moderna proposed construction of the full term, "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$," so that the parties' constructions would make sense in the context of the claims. However, the parties do not dispute that "$C_{10}$-$C_{20}$" refers to 10-20 carbon atoms or that "at the α-position relative to $M^1$" refers to the carbon directly next to $M^1$. The dispute hinges on the language "alkyl group that is branched."

"branched" can include a tertiary carbon at the α-position, consistent with Moderna's construction. As to its expert evidence, Dr. Scheidt repeats the written description arguments in Alnylam's brief but provides no insight on the key issue: what makes a hydrocarbon branched versus straight.

Alnylam's construction likewise fails to address that question. It leaves the key language – "an alkyl group that . . . is branched" – untouched and thus does nothing to resolve the parties' dispute or aid the jury. Alnylam's unhelpful construction should be rejected, and Moderna's accepted.

**a. The Plain and Ordinary Meaning and The Patent's Express Definitions Mandate Moderna's Construction**

The parties agree that the term "alkyl group that is branched" invokes the patents' express definition of "alkyl." (*Supra*, 35; Ex.3, ⁋20.) The patent defines "alkyl" as "a straight or branched chain saturated hydrocarbon moiety." ('479 Patent, 376:13-21; Ex.45, ⁋62) The claim language "alkyl group ***that is branched***" refers to the "branched chain" portion of the "alkyl" definition. (Ex.45, ⁋62) Thus, although Alnylam's construction does not reflect it,[21] the parties seem to agree that the term "alkyl group that is branched" refers to a "branched chain saturated hydrocarbon

[21] Even though Alnylam concedes that the definition of "alkyl" applies (*Supra*, 35.), its construction fails to implement that definition. Moderna's construction, in contrast, provides that an "alkyl group" is "a saturated hydrocarbon moiety," consistent with the express definition.

moiety." Again, the question is when is a saturated hydrocarbon moiety a "branched" chain?

Skilled artisans understood that a saturated hydrocarbon moiety must include ***a tertiary or quaternary carbon*** to be a "branched chain." (Ex.45, ¶33; Ex.45D, 21; Ex.45E, 87-88; Ex.51, 83; Ex.45F, 269; Ex.45C, 4; Ex.45H; Ex.45I; Ex.45J.) That is because a saturated hydrocarbon moiety consists ***entirely*** of carbon and hydrogen atoms with single bonds between the carbons. (Ex.51, 82; Ex.45, ⁋30.) Hydrogen atoms bond to a single carbon atom and cannot form a "branch" because they effectively end the molecule. (Ex.51, 82; Ex.45, ⁋27.) But a carbon atom bound to three or four other carbon atoms creates a branching point in the hydrocarbon. (Ex.51, 83; Ex.45, ⁋33; Ex.45D, 21; Ex.45E, 88.)

To illustrate this concept, chemistry textbooks explain that for straight hydrocarbon carbon chains "you can draw a line connecting all the carbons" without "retracing your step or lifting your pencil from the paper." (Ex.51, 83; Ex.55, 52, FN 16; Ex.45, ⁋34, 66.) With branched hydrocarbon chains you ***cannot*** draw a line connecting all the carbons without "retracing your step or lifting your pencil from the paper." (*Id.*)

For instance, the following saturated hydrocarbon moiety includes only a primary carbon atom (shown in green) and secondary carbon atoms (shown in blue) and does not include a branching point:




('479 patent, 74:8-12 (annotated); Ex.45, ⁋35, 65.) One can draw a line connecting all the carbon atoms in this chain without lifting one's pencil or retracing one's step:




('479 patent, 74:8-12 (annotated); Ex.45, ⁋35, 67.) The alkyl group is thus a straight chain.

In contrast, the saturated hydrocarbon moiety below, specifically identified by the '479 patent as "branched," includes a tertiary carbon, shown in yellow, that forms a branching point:



('479 patent, 55:21-23, 55:58-67 (annotated); Ex.45, ⁋36, 64.) As shown below, because it has a tertiary carbon, one cannot draw a line through all of the carbons in the chain without lifting or retracing, making it a branched chain:



('479 patent, 55:21-23, 55:58-67 (annotated); Ex.45, ⁋36, 67.)

Alnylam, nonetheless, contends that a straight chain hydrocarbon (***without*** a tertiary or quaternary carbon) ***becomes*** branched if attached to an oxygen atom. For instance, Alnylam alleges that the highlighted saturated hydrocarbon moiety in SM-102 shown below is a branched chain:




(Ex.31, 8; Ex.32, 6; Ex.45, ⁋38.) But as shown above, one can draw a straight line through all the carbons without retracing or lifting the pencil, making it a straight hydrocarbon chain.

Alnylam's mistake is that it assumes that a skilled artisan would consider the ***oxygen atom*** when considering if a "saturated hydrocarbon moiety" is a "branched chain." To the contrary, as explained above, hydrocarbons include ***only*** carbon and hydrogen atoms, not oxygen atoms. (Ex.51, 82; Ex.45, ⁋37, 68-71.) And a

hydrocarbon is straight if "you can draw a line connecting all the ***carbons***," not other atoms like oxygen, without "retracing your step or lifting your pencil from the paper." (Ex.51, 83.) As a result, a skilled artisan would not understand a carbon atom bound to two other carbons, a hydrogen, and an oxygen (like the carbon at the α-position in SM-102) to be "branched." (Ex.45, ⁋37, 68-71.)

This plain and ordinary meaning of "alky group that is branched" is consistent with the patent's express definition of the similar term "branched alkyl." ('479 Patent, 376:41-47 ("carbon atom bound to at least three other carbon atoms"); Ex.45, ⁋61-71.) That is no surprise because the term "alky group that is branched" does no more than reorder the words of the term "branched alkyl." In addition to their similar appearance, the evidence confirms that they are in fact synonymous:

- Neither of the experts has identified any substantive difference between the terms. (Ex.45, ⁋48, 61-85; Ex.3.)

- In the Pfizer case, Alnylam agreed that "alkyl group that is branched" did not "need any additional construction" in light of the Court's earlier construction of "branched alkyl." (Ex.54, 1, FN2.)

- During prosecution, Alnylam characterized the then pending claims, which recited an "alky group that is branched," as covering "a hydrophobic tail . . . where R13 is a ***branched alkyl group***." (Ex.52, 2, 8.)

- The paragraph of the patent that includes the definition of "alkyl" (that the parties agree controls here) goes on to provide examples of "branched alkyl" groups. ('479 Patent, 376:13-21.)

Because the terms are synonymous, the Court could simply apply its construction of "branched alkyl" from the -335 case to "alkyl group that is branched." *See Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F.App'x 994 (Fed. Cir. 2006) (finding the trial court properly construed "circular member," "stent member," "ring," and "endovascular support member" to have the same meaning as "stent" because the patentee used the terms "synonymously"); *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (finding the "correspondence" between "surrender value protected investment credits" and "stable value protection" supported the same construction for the two terms); *cf. Shire LLC v. Abhai, LLC*, 219 F.Supp.3d 241, 245 (D. Mass. 2016) ("Differently worded but similar claims in related patents . . . may still be construed identically where those patents share a specification and other technical details."); *Bioverativ Inc. v. CSL Behring LLC*, No. 1:17-CV-00914-RGA, 2019 WL 1276030, at *4 (D. Del. Mar. 20, 2019) (same).

At the very least, the express definition of "branched alkyl" strongly supports Moderna's construction of the similar term "alkyl group that is branched." *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (the written description "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

**b. The Written Description Supports Moderna's Construction**

The written description includes a multitude of examples that further support the Moderna's construction. The Summary section includes ten generic chemical formulas of the invention. ('479 Patent, 2:9-19:2.) Five of those formulas do not allow for branching in the tails, whereas the other five do. ('479 Patent, 2:9-3:65, 3:66-5:51, 5:53-6:49, 6:50-10:29, 10:30-11:3.) Of the formulas that do allow for branching, all five can have a tertiary or quaternary carbon at the point of branching, consistent with Moderna's construction. (Ex.45, ⁋49, 87-88.)

For instance, Formula II includes lipids that can have "a branched alkyl at the α-position adjacent to the biodegradable group." ('479 Patent, 3:66-5:51.) Many of the potential species of Formula II include a tertiary carbon at the α-position, consistent with the Moderna's construction. As one example, the patent provides that the $M^1$ group in Formula II can be "—OC(O)—." ('479 patent, 5:1-2.) When $M^1$ is —OC(O)—, every species includes a tertiary carbon at the α-position, as shown below:



('479 Patent, 3:66-5:51 (annotated); Ex.45, ¶50, 88.) Several other $M^1$ groups also result in a tertiary carbon at the α-position. ('479 Patent, 5:1-18; Ex.45, ¶50, 88.)

Next, the Detailed Description includes thousands of exemplary lipid and hydrophobic tail structures. ('479 Patent, 44:30-56:18, 55:59-60:54, 75:4-358:67.) Apart from the definitions discussed above, the Detailed Description uses the term "branched" ***only once***, when describing "suitable tail groups" where "$R^{13}$ is a branched alkyl." ('479 Patent, 55:19-23.) The patent proceeds to identify around twenty "suitable" $R^{13}$ groups with such "branched alkyls." ('479 Patent, 55:56-60:35.) ***Every single one*** of those $R^{13}$ branched alkyl groups includes a tertiary carbon atom at the point of branching, consistent with Moderna's construction. (*Id.*; Ex.45, ¶53, 89)

The patent does not indicate that any of its thousands of additional examples are "branched" or include an "alkyl group that is branched." Nonetheless, the vast majority of those structures include at least one tertiary carbon in one of their tails, again consistent with Moderna's construction. ('479 Patent, 44:30-56:18, 55:59-60:54, 75:4-358:67; Ex.45, ¶54, 89.)

In sum, the written description repeatedly teaches that an alkyl group is "branched" if it includes a tertiary or quaternary carbon at the point of branching, consistent with the plain and ordinary meaning and the patent's express definitions.

### c. Alnylam's Arguments Do Not Undermine Moderna's Construction

Alnylam's arguments against Moderna's construction disregard the science and mischaracterize intrinsic evidence.

**The Claim Language.** Alnylam is wrong that the claim language "expressly specif[ies] . . . a carbon directly bonded to two other carbons, an oxygen, and a hydrogen" at the α-position. (*Supra*, 37.) Viewed with the correct scientific lens, the claim language clearly allows for a tertiary carbon (and in no way requires a secondary carbon) at the α-position.

The claims require that at least one of the hydrophobic tails has the formula $R^{12}$-$M^1$-$R^{13}$, where $M^1$ is an ester group in either the —OC(O)— or —C(O)O— orientation, as depicted below:




('479 Patent, 503:12, 503:29-30; Ex.45, ¶75.)

The claims next provide that "$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$." ('479 patent, 503:13-14.) As discussed above, (1) an "alkyl group" consists entirely of carbon and hydrogen atoms (a "hydrocarbon") and

has only single bonds between the carbon atoms ("saturated"), (2) "$C_{10}$-$C_{20}$" indicates a total of 10-20 carbon atoms in the group ("$C_{10}$-$C_{20}$" alkyl), and (3) "at the α-position relative to $M^1$" specifies the carbon atom next to the ester group. (Ex.45, ⁋76.) This claim language is illustrated below for both ester orientations, with the squiggly lines showing additional carbons or hydrogens:




('479 patent, 503:13-14; Ex.45, ⁋77.) Thus, before considering the meaning of alkyl group "that is branched," the claim language allows the remaining three atoms attached to the α-carbon to be either a hydrogen ***or*** a carbon.

For the —OC(O)— orientation, the α-carbon has to be bound to the carbon atom in the ester group. If two of the three additional atoms bound to the α-carbon are carbons, then the α-carbon is tertiary, as shown on the left below. If all three are carbons, then the α-carbon is quaternary, as shown on the right below.




('479 patent, 503:10-14; Ex.45, ¶78)

For the —C(O)O— orientation, the α-carbon is bound to an oxygen atom in the ester group. If all three of the additional atoms bound to the α-carbon are carbons, then the α-carbon is ***tertiary***, as shown below:




('479 patent, 503:10-14; Ex.45, ¶79.) The claim language thus allows for a tertiary carbon (*i.e.*, a carbon "bound to at least three other carbon atoms") with either ester orientation and in no way requires a secondary α-carbon.

To reach the opposite conclusion, Alnylam incorrectly argues that the claim language "precisely describes" the following structure:




(*Supra*, 33-34) Although not expressly shown, a skilled artisan would understand that structure to depict a hydrogen attached to the α-carbon (in addition to the oxygen and two carbons). But the claim language does not require a hydrogen. It is silent and thus allows for ***either*** a hydrogen or ***a carbon*** as shown below:




(Ex.45, ¶82.) If the fourth atom is a carbon, then the α-carbon is a tertiary carbon atom (*i.e.*, bound to three other carbon atoms). (*Id.* at ¶83.) Thus, with ***either*** ester orientation, the claim language permits a tertiary α-carbon, consistent with Moderna's construction. Put another way, the claim language does not require, much

less "expressly specify" (*supra*, 37), a secondary carbon atom at the α-position with a —C(O)O— ester group.

**The Written Description.** Alnylam incorrectly argues that the written description "time and time again specifically identifies at least two carbon binding alkyl groups that are branched." (*Supra*, 43.) That is simply not true.

The "**representative . . . branched alkyl groups**" included in the definition of "alkyl" are not inconsistent with Moderna's construction. ('479 Patent, 376:14-22.) Initially, those examples fall outside the claim scope because they do not have the required 10-20 carbon atoms ("$C_{10}$-$C_{20}$" alkyl). Regardless, each example can include a tertiary carbon – and does not require a secondary carbon – consistent with Moderna's construction. Three of the five examples include a tertiary carbon (isopropyl, tert-butyl, isopentyl) or quaternary carbon regardless of the group they are bound to. (Ex.45, ⁋90-91.) The other two examples (sec-butyl and isobutyl) include a tertiary carbon when bound to another carbon, as shown below:




isopropyl group




*sec*-butyl group

(*Supra*, 36 (annotated in blue); Ex.45, ¶91.) Alnylam thus repeats its error with the claim language, ignoring the carbon atoms' fourth bond.[22]

Contrary to Alnylam's position, **Formulas I and II** are also entirely consistent with Moderna's construction. As Alnylam concedes, each of these formulas also falls outside the scope of the claims. (Ex.55, 17-18.) Regardless, as discussed above, many of the species of these two formulas include a tertiary carbon in the hydrophobic tails, consistent with Moderna's construction. (*Supra*, III.B.2.b.)

Moderna's construction is also consistent with **"Compound 1."** Alnylam argues that Compound 1 is **"**disclosed ***four times*** in the specification" and "precisely specifies two carbons bound to the α-branched carbon in $R^{13}$." (*Supra*, 39.) But the patent never describes Compound 1 as "branched" – including in any of those four disclosures – much less suggests that Compound 1 includes an "alkyl group that is branched." Moreover, like many of Alnylam's other examples, Compound 1 falls outside of the claim scope regardless of the construction of "alkyl group that is branched."[23]

---

[22] Alnylam also makes no attempt to explain why these examples of "branched alkyls" are relevant to the meaning of the term "alky group that is branched," but the express definition of "branched alkyl," which appears three paragraphs later, is not.

[23] Although not claimed in the '479 patent, Alnylam did claim Compound 1 (by chemical structure) in the first granted patent in the patent family. (Ex.41, 549-550 (claim 19, fifth from the top).)

Finally, similar problems plague Alnylam's reliance on a structure pieced together from **Tables 2D and 2E**. (*Supra*, 41-42.) The patent does not indicate that the examples in Table 2E are "branched," much less that they include "alkyl groups that are branched." Even putting that aside, Alnylam cherry-picks a single example from the fifteen "representative hydrophobic chain[s]" in Table 2E and combines it with another cherry-picked example of a "representative biodegradable moiety" from Table 2D to create a combination nowhere called for in the patent. (*Id.*) But Alnylam fails to acknowledge that its Table 2E example ***would*** include a tertiary carbon if Alnylam selected a different biodegradable group from Table 2D, such as —OC(O)—, as shown below:




('479 Patent, 71:51-55, 74:23-30 (annotated); Ex.45, ⁋93.) Thus, even Alnylam's hand-picked example from Table 2E is consistent with Moderna's construction.

**The Prosecution History.** The prosecution history exchange relied on by Alnylam does not undermine Moderna's construction and, if anything, supports it.

Alnylam mischaracterizes that exchange by suggesting that the applicants amended the claims to add the disputed claim term and ***then*** the examiner rejected

the claims over certain prior art lipids. (*Supra*, 43-44.) Alnylam has it backwards. In July 2022, the examiner rejected the pending claims as anticipated over prior art lipids that had a carbon atom at the central moiety and a secondary carbon at the α-position of the hydrophobic tails. (Ex. 7, 3-4.) In ***response to that rejection***, the applicants ***amended the claims*** to require an $R^{13}$ alkyl group "that is branched at the α-position relative to $M^1$":

**AMENDMENTS TO THE CLAIMS**

1-19. (Canceled)

20. (Currently Amended) A lipid compound, comprising a head group, two hydrophobic tails, and a central moiety to which the head group and the two hydrophobic tails are directly bonded, wherein:

the central moiety is a nitrogen atom;

each of the two hydrophobic tails independently consists of an aliphatic group interrupted by an ester group; and

at least one of the hydrophobic tails has the formula $-R^{12}-M^1-R^{13}$, wherein:

$R^{12}$ is a $C_4$-$C_{14}$ alkyl group,

$M^1$ is ~~a biodegradable group~~ an ester group, and

$R^{13}$ is a $C_{10}$-$C_{20}$ alkyl group that is branched at the α-position relative to $M^1$;

(Ex.52, 2.) Thus, if anything, the applicants appear to have amended the claims to distinguish the prior art's secondary carbon at the α-position from the newly-added "alkyl group that is branched at the α-position," which requires a tertiary carbon.

The applicants' written response to the rejection also does not support Alnylam's position. The relevant claim terms were never mentioned in this

exchange, and it thus cannot shed any light on the meaning of the disputed term. *Phillips*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

Moreover, the applicants' decision ***not*** to distinguish the prior art based on the claim term "alkyl group that is branched" in its written response cannot change the meaning of that term. *See, e.g., Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1342 (Fed. Cir. 2012) (rejecting prosecution disclaimer arguments because the applicant's statements distinguishing the prior art did not focus on the disputed term).

**Expert Testimony.** Alnylam's expert testimony does not change the outcome. Where, as here, the intrinsic evidence is clear, expert testimony cannot be relied on to contradict that clear meaning. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1324 (Fed. Cir. 2023) (finding that the district court erred in relying on expert testimony where the intrinsic evidence was clear as to the meaning of the claim). But even considering his testimony, Dr. Scheidt simply repeats many of the same arguments that Alnylam makes in its brief. (Ex.3, ¶¶27-48.) He does not opine that there is any substantive difference between the terms "alkyl group that is branched" and "branched alkyl." (Ex.3.) Nor does he provide any testimony on the real dispute between the parties: what makes an "alkyl group" "branched." (*Id.*)

#### d. Alnylam's Proposed Construction Should Be Rejected

In contrast to Moderna's construction, Alnylam's proposed construction does nothing to address the parties' dispute. It leaves the language central to the parties' dispute – "alky group that is branched" – completely unchanged. Alnylam thus effectively asks the Court to find that the language "alkyl group that is branched" needs no construction, improperly leaving the issue to the jury. *See Eon Corp. IP Holdings LLC v. Silver Spring Networks*, 815 F.3d 1314 (Fed. Cir. 2016) (finding the district court committed legal error by "determining only that the teams should be given their plain and ordinary meaning . . . leaving it for the jury to decide.")

### 3. Alnylam's Reply Position

Moderna improperly seeks to exclude secondary carbons at the α-position to avoid infringement but never demonstrates that such secondary carbons are excluded by the claims. They are not. In its efforts to deviate from the meaning a POSA would ascribe to "alkyl group that is branched at the α-position," Moderna resorts to irrelevant arguments about the claims' scope permitting tertiary or quaternary carbons and written description embodiments that disregard the claims' limitation "at the α-position." As Alnylam has shown, when an alkyl group is branched at the α-position, secondary carbons at the α-position in $R^{13}$ are permitted. This is unlike branching at other positions that inherently requires tertiary or quaternary carbons.

As an initial matter, the construction here is not governed by the -335 case. Unlike there, Moderna concedes that the claim language here is different and does not argue that lexicography applies. As such, the term should carry its ordinary and customary meaning. *Thorner v. Sony Computer Ent'mt Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining "[t]he words of a claim are generally given their ordinary and customary meaning" unless there is lexicography or disavowal).

**a. Branched at the α-position permits secondary carbons**

The only dispute is whether the term's plain meaning excludes secondary carbons at the point of branching for claims that require α-branching. It does not. Moderna—starting with extrinsic evidence—argues that "[s]killed artisans understood that a saturated hydrocarbon moiety must include *a tertiary or quaternary carbon* to be a 'branched chain.'" *Supra*, III.B.2.a. This is directly contradicted by the intrinsic record and the declarations of Dr. Scheidt—which show that when branching occurs at the α-position to an ester, as claimed, secondary carbons are permitted. *Phillips*, 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); Ex. 3, ¶30; Ex. 57 (Scheidt 2nd Decl.), ¶¶ 28-32.

Moderna characterizes the dispute as one over the meaning of "branched," but Moderna's answering brief concedes that $R^{13}$, as claimed, is "branched" where the α-carbon *is bound to two other carbons in $R^{13}$*. Specifically, Moderna admits that $R^{13}$ can have the following structure within the red box when $M^1$ is —OC(O)—:




As depicted, in $R^{13}$ the carbon at the α-position (in yellow) is branched to two other carbons in $R^{13}$. The third carbon is in $M^1$—not $R^{13}$. Moderna thus agrees that branching occurs at the α-carbon (in yellow) in $R^{13}$ when there are only two carbons and a hydrogen. Ex. 45, ¶78 (Pungente agreeing α-carbon in $R^{13}$ is "branched" in the above structure); Ex. 57, ¶30.

Tellingly, Moderna never disputes that the same $R^{13}$ structure falls within the claims when $M^1$ is —C(O)O—. Instead, it argues only "[t]he claim language thus

*allows* for a tertiary carbon … and in no way *requires* a secondary α-carbon." *Supra*, III.B.2.c (emphasis added). But that does not dispute that the claim language also allows a secondary α-carbon, which would result in the same tail structure as above (in the red box) attached to an oxygen in $M^1$ in the modified drawing below:




Moderna's construction, which would require excluding secondary carbons, is thus wrong and inconsistent with the plain claim language that requires the lipid to be branched at the α-position. Ex. 57, ¶¶ 28-31.

Moderna's argument that something is not branched simply because it is "attached to an oxygen atom" is wrong in the context of the claims. *Supra*, III.B.2.a. Moderna places great reliance on the word "hydrocarbon" and contends the parties

agree that the definition of "alkyl" applies, inferring that it is somehow limiting by using the word "hydrocarbon." Not so. The claimed lipids encompass atoms other than just hydrogens and carbons, like an oxygen. POSA would consider these other heteroatoms in the context of a claim term that encompasses branching next to these heteroatoms, *i.e.*, an oxygen, and therefore understand that a carbon branching at that α-position would encompass secondary carbons, as Dr. Scheidt explains. Ex. 57, ¶8.

This is fully consistent with the Oxford Dictionary (Ex. 45C) definition of a "branched chain" and other references Moderna's expert invokes, as Dr. Scheidt also explains. Ex. 57, ¶12. Moreover, the written description expressly *specifies* secondary carbons as branched through the definition of "alkyl" that identifies "isopropyl" and "sec-butyl." *Infra*, III.B.3.b. To POSA, "sec" before "butyl" expressly identifies the carbon as a "secondary" carbon, as opposed to "tert-butyl" that refers to a tertiary carbon. Ex. 57, ¶40.

Compounding Moderna's error, it invokes an informal description of retracing from hydrocarbons and then misapplies it. This informal retracing works only for compounds containing only carbon and hydrogen atoms and does not work for compounds containing heteroatoms. Ex. 57, ¶14.

Moderna then redraws its accused SM-102 lipid to purportedly show that it is not branched. *Supra*, III.B.2.a. [redacted]

[redacted]




D.I. 1, ¶72 (annotated). [redacted]

To argue a contrary result, Moderna and its expert rely upon examples of *non-alpha carbons* in the ’479 Patent. Moderna incorrectly raises column 55 that it contends shows “a branching point” and is the only use of the term in the Detailed Description. *Supra*, III.B.2.a. That argument disregards the Summary, which *uses the term in connection with the α-branching formulas*, *infra*. It further disregards

that the text and figures at column 55 do not show an alkyl group branched *at the α-position*:




Instead, it depicts branching at the ε-position. Ex. 57, ¶27. Moderna's expert similarly relies on non-alpha position examples drawn from this same section to the exclusion of α-position examples shown elsewhere in the specification. *See* Ex. 45, ¶¶51-54 (identifying only non-alpha branched structures); Ex. 57, ¶¶25-27. Branching at the α-position is critically different from branching at other positions because—as shown with the $R^{13}$ example above—*a tertiary carbon is not required*. Ex. 57, ¶¶28-32.

Moderna argues that "Alnylam's mistake is that it assumes that a skilled artisan would consider the oxygen atom when considering if a 'saturated hydrocarbon moiety' is a 'branched chain.'" But Moderna is wrong to exclude heteroatoms like the oxygen. Moderna is the one that makes incorrect assumptions with its efforts to conflate branching at the α-position with branching at other

positions and reading into the claim limitations that are not there. *E.g.*, Ex. 45, ¶¶36 (referring to non-alpha branched examples), 53-54 (same), 64 (same), 37 (referring to "carbon chain" examples despite there being no carbon chain limitation); Ex. 57, ¶¶25-26.

Moderna argues that "alky group that is branched" is "synonymous" with "branched alkyl." To the extent that Moderna is arguing that lexicography applies here, it does not. The Federal Circuit's precedent provides that lexicography results only where a patentee has "clearly express[ed] an intent" in the written description to redefine a term. *Thorner*, 669 F.3d at 1365; *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Critically, this inquiry necessarily requires not just "a plausible reading of [an] excerpt [in the patent] in isolation," but rather, is "considered in the context of the remainder of the written description and the claims." *Baxalta*, 972 F.3d at 1347; *see also Phillips*, 415 F.3d at 1313 (en banc) (POSAs are "deemed to read the claim term" in the "context of the entire patent, including the specification").

Moderna contends that "the evidence confirms that they are in fact synonymous" but none of its so-called "evidence" establishes as much. Notably, "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Karlin Tech.*, 177 F.3d at 971-72. Moderna has not overcome that presumption.

And the cases Moderna cites do not support a contrary result. In the non-precedential *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, the Federal Circuit found disclaimer in one patent resulted in disclaimer in others where "the patentee affirmatively links the meaning of the claims subject to the initial disclaimer with claims in later issued patents." 182 F. App'x 994 at 998. There, the specification of the earlier patent used terms synonymously and the claims in the latter patent used one of those same terms. *Id.* As such the Federal Circuit held that disclaimer applied to the term in the latter patent. *Id.* Similarly, in *Bancorp Servs.*, the term "SVP" was found to correspond to the similar term "surrender value protected." 359 F.3d at 1373.

Here, Moderna has not identified any such affirmatively linking language in the written description that suggests a clear intention to establish synonymous or corresponding use. Nonetheless, even if the terms are synonymous, the intrinsic evidence "otherwise specifies" that secondary α-carbons fall within the scope of the "alky group that is branched." Ex. 57, ¶¶23-41.

**b. Nothing in the written description suggests limiting the claims.**

**Formulas I and II**. Moderna concedes that Formula II depicts "a branched alkyl at the α-position adjacent to the biodegradable group," but then fails to faithfully read the text and drawing that specifies a secondary carbon at the α-position. *Supra*, III.B.2.b, III.B.2.c. The text expressly calls out that what is

depicted is "a branched alkyl at the alpha position adjacent to the biodegradable group" ('479 Patent, 2:11-12, 3:67-4:1) and lists as a biodegradable group (($M^1$) and ($M^2$)) to include "—C(O)O—" (*id.* at 3:5-6, 5:1-2); Ex. 57, ¶35.

Formulas I and II each identify a hydrogen atom (H) binding to the "branched alkyl at the alpha position," *viz.*:




'479 Patent, 4:5-13.




'479 Patent, 2:15-23. The express hydrogen identification is a departure from normal convention where the hydrogen is typically not drawn. Ex. 3, ¶¶30, 34. The

express inclusion of the hydrogen atom clearly and specifically teaches a secondary carbon at the α-position, with the biodegradable group being —C(O)O—, precisely what Alnylam contends is within the scope of the claims. Ex.57,¶¶35-38.

Moderna says for Formulas I and II that "many of the species of these two formulas include a tertiary carbon in the hydrophobic tails" (*supra*, III.B.2.c), which Alnylam does not dispute. Moderna never addresses the actual issue that these formulas also depict a secondary carbon at the α-position when $M^1$ or $M^2$ is —C(O)O—. Nor does Moderna ever contend that Formulas I and II always require a tertiary carbon atom. Ex. 57, ¶36.

**Compound 1.** For Compound 1 and the representative hydrophobic chains of the present invention, Moderna again does not dispute that these structures depict examples of a secondary carbon at the α-position in $R^{13}$.




Instead, Moderna asserts that the "patent never describes Compound 1 as 'branched.'" *Supra*, III.B.2.c. That disregards the understanding of a POSA and the

chemical drawings themselves, which specify a carbon at the α-position next to the biodegradable group branching to two other carbons in $R^{13}$. Ex. 3, ¶35; Ex. 57, ¶41. The "language" of the drawing is just as persuasive as using words. *Ariad Pharms.*, 598 F.3d at 1350, 1352; *Advanced Steel*, 808 F.3d at 1317-18. Notably, Moderna's response does not dispute this principle or these authorities that Alnylam opening sets forth.

**"Present Invention" and Tables 2D & 2E Groups.** Moderna's attempts to discredit Tables 2D & 2E similarly lack merit. *Supra*, III.B.2.c. Moderna does not dispute that the "present invention" specifies a "combination" of a biodegradable group in Table 2D and the α-branched hydrophobic moiety attached thereto (Table 2E):




'479 Patent, 71:46-50, 74:24-30.

Instead, Moderna strangely points out that Table 2E contains representative branched hydrophobic chains that would include "a tertiary carbon *if* Alnylam

selected a different biodegradable group from Table 2D." *Supra*, III.B.2.c (emphasis added). But that is irrelevant. The point is that the written description demonstrates that when the biodegradable group is —C(O)O— a secondary carbon is at the α-position in the $R^{13}$ tail. That point is undisputed.

Moreover, Moderna's accusation of Alnylam "cherry-picking" is baseless. *Id.* Unlike the figure above that includes branching at the α-position as the claims require, the other figures Moderna relies upon *do not show* α-*branching*. That Moderna can find support for tertiary carbons elsewhere in Table 2E for branching *that is not at the* α-*position* is irrelevant, as the written description specifies that a "combination" of any of the groups is the "present invention," specifying a secondary carbon at the α-position. '479 Patent, 61:30-34.

Moderna would have the Court disregard the above structure because it is not explicitly labeled "branched" or to "include 'alkyl groups that are branched.'" *Supra*, III.B.2.c. But, again, that is not how patents are interpreted. *Ariad Pharms.,* 598 F.3d at 1350. Whether labeled "branched" or not, it undisputedly depicts a secondary carbon at the α-position. Ex. 3, ¶¶39-40; Ex. 57, ¶39.

**Representative Branched Alkyls from "Alkyl" Definition**. Moderna contends that "[t]hree of the five examples include a tertiary carbon (isopropyl, tert-butyl, isopentyl) or quaternary carbon regardless of the group they are bound to." *Supra*, III.B.2.c. But as to "[t]he other two examples"—*i.e.*, "isopropyl" and "sec-

butyl"—Moderna does not (because it cannot) contend that these compounds require a tertiary carbon. Moderna argues that they "include a tertiary carbon *when* bound to another carbon" atom. *Id.* (emphasis added). But there is no requirement that they be bound to another carbon atom.

Moderna does not dispute that isopropyl and sec-butyl can contain only secondary carbons when bound to a heteroatom. Rather, Moderna incorrectly contends that Alnylam is ignoring the fourth carbon bond, which it argues "*can* include a tertiary carbon." But like in all the other examples Moderna relies on that bond does not have to be a carbon. For example, it could be an oxygen, as depicted below:



The description does not limit the groups. *See* '479 Patent, 376:13-22; Ex. 57, ¶40.

Finally, Moderna is wrong to argue that these representative branched alkyl examples fall outside the claims to suggest they are somehow irrelevant. *Supra*, III.B.2.c. The examples of α-branching in the written description inform the patentees' intent and understanding in the context of claims expressly requiring α-branching.

**c. Prosecution history supports Alnylam's construction**

Moderna's arguments regarding the prosecution history fail to identify anything that would limit this term to tertiary and quaternary carbons.

First, Moderna is incorrect that the amendment was "to distinguish the prior art's secondary carbon at the α-position." The Patentee distinguished the prior art based on the central moiety: "The central moiety in Compounds A-C of Manoharan is a carbon atom, as highlighted above. In contrast, the central moiety in the presently claimed lipid compounds is a nitrogen atom." Ex. 7 at 10 (emphasis in original). The Patentee explained, "*[f]or this reason*, Manoharan does not anticipate claims 20, 21, 25, 27, 29, 30, and 32." *Id.* (emphasis added). The prosecution history thus does not suggest that the claim "requires a tertiary carbon," as Moderna argues. Ex. 57, ¶43.

Second, Moderna argues that Alnylam "mischaracterizes" the exchange between the patentee and the examiner. *Supra*, III.B.2.c. Moderna misreads

Alnylam's arguments, which explain in detail that the amended claims were in response to the examiner rejection. *Supra*, III.B.1.c.

Finally, Moderna's argument that this exchange "cannot shed any light on the meaning of the disputed term" is misplaced. "[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent [and] was created by the patentee in attempting to explain and obtain the patent." *Phillips*, 415 F.3d at 1317. The exchange shows that the Patentee never attempted to distinguish the Manoharan compounds based on their disclosure of secondary carbon α-branching—suggesting that Alnylam is right that such structures fall within the scope of the claims. Moderna's reliance on *Grober* is similarly misplaced because neither party is arguing disclaimer. *See Grober*, 686 F.3d at 1342-43 (holding no reason to limit claims based on disclaimer).

**d. Expert testimony**

Alnylam has submitted the declaration of Dr. Scheidt to assist the Court in understanding how a POSA would read the '479 Patent's disclosure, including the various chemical structures, and what a POSA would understand from that disclosure. *See* Ex. 3. In response, Moderna contends that "the intrinsic evidence is clear." *Supra*, III.B.2.c. To the extent the Court agrees, it should not resort to any extrinsic evidence, including Moderna's. *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). But should the Court find it

useful to understand the perspective of a POSA and the many the errors in Moderna's positions, Dr. Scheidt addresses those points directly in his original and second declaration. Ex. 3, ¶¶27-48; Ex. 57, ¶8-22.

#### e. There is nothing improper about Alnylam's construction

Moderna contends that "Alnylam's proposed construction does nothing to address the parties' dispute." *Supra*, III.B.2.d. But the parties generally agree on the meaning of the term with one exception—whether it must exclude secondary α-carbons at the point of branching. Rejecting Moderna's construction and holding the claims permit secondary α-carbons at the point of branching resolves the dispute and properly leaves for the jury the question of infringement. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

### 4. Moderna's Sur-Reply Position

Moderna previously explained that the plain meaning and the patent's express definitions show that an "alkyl group" must include a tertiary or quaternary carbon to be "branched." (*Supra*,III.B.2.a.) Alnylam agrees that an "alkyl group that is branched" ***generally requires*** a tertiary or quaternary carbon. (*Supra*,66 ("branching at other positions [] inherently requires tertiary or quaternary carbons.").) But Alnylam incorrectly argues that the Court should depart from the plain meaning and express definitions because the claimed alkyl group is branched "at the α-position." Nothing in the intrinsic record supports such a departure.

**Plain Meaning and Express Definitions.** Alnylam is wrong that skilled artisans would consider the oxygen atom in the claimed ester when assessing if an "alkyl group" is branched. (*Supra*,69-70.) In fact, the patent's definitions show the opposite. The patent's express definition of "alkyl" refers to a "branched chain . . . ***hydrocarbon*** moiety"—a molecule made entirely of carbon and hydrogen atoms—and does not mention "heteroatoms."[24] (Ex.1,376:13-16.) Likewise, the definition of the synonymous term "branched alkyl" requires "one carbon atom . . . bound to at least three other carbon atoms" and does not mention heteroatoms. (*Id*.,376:41-46.) In contrast, the other definitions explicitly refer to heteroatoms. (*Id*.,377:9-36.)

The plain meaning evidence is consistent with the express definitions. McMurray explains that a hydrocarbon is "branched" if one can draw a line "connecting all ***the carbons***" without "retracing your path or lifting your pencil from the paper." (Ex.51,83.) Alnylam now says McMurray is inapplicable (*supra*,70) but recently told the Federal Circuit the exact opposite:

> The specification [of the related '933 patent] sets forth ***the terms alkyl***, alkenyl, and alkynyl and ***describe them as either a straight chain or a branched chain***. The record contained the commonsense textbook quote that a ***straight carbon chain is distinguished from a branched carbon*** chain because the "difference between the two is that you can

[24] Alnylam previously argued that the disputed term "evinces the intent to invoke" the express definition of "alkyl" (*supra*,35) but now changes course and argues that the definition does not apply (*supra,*69-70). However, this Court has already found that the definition of "alkyl" is "clear and unmistakable lexicography." (No. 22-335, D.I.114,1.)

> ***draw a line connecting all the carbons*** of a straight-chain alkane without retracing your step or lifting your pencil from the paper."

(Ex.55,51-52n.16 (citing McMurray).) Multiple other sources confirm that skilled artisans would only consider carbon atoms, not heteroatoms, in assessing if an "alkyl group" is "branched." (Ex.45,¶37; Ex.45C; Ex.45D,74; Ex.64,842; Ex.65,134.)

To support its position, Alnylam does not cite relevant evidence but instead relies on confidential Moderna documents (filed under seal) with no attempt to show they were publicly available or reflect the ordinary usage of any term at the time of the invention. (*Supra*,70-71.) And, even so, none of these documents use the term at issue, "alkyl group that is branched," or the synonymous term "branched alkyl." [redacted]

Alnylam also incorrectly argues that Moderna "admits" that "$R^{13}$, as claimed, is 'branched' where the α-carbon is bound to two other carbons ***in $R^{13}$***." (*Supra*,68-69.) Rather, Moderna has consistently said that the same alkyl group may be branched when bound to the carbon in the claimed ester (forming a tertiary carbon) but not branched when bound to the oxygen in the ester. And, to the extent Alnylam is now arguing that the carbon in the ester should not count in assessing if an "alkyl group" is "branched," Alnylam argued the exact opposite in the -335 case. (Ex.63,159-60.) And the Court accepted that argument. (No. 22-335, D.I.114,3

("And is not unreasonable to assert, as Alnylam does, that $R^{13}$ and $M^1$ can be distinct but still share a carbon atom.").)

In addition, Alnylam does not identify ***any*** substantive difference between the terms "alkyl group that is branched" and the previously construed "branched alkyl." Alnylam, for instance, has no substantive response to evidence showing that it equated those terms in the written description, to the Patent Office, and to this Court in the Pfizer case. (*Supra*,53.) Alnylam argues that the terms are legally presumed to have different meanings, but claim differentiation is not a hard and fast rule and is "not as strong across related patents as it would be if the different claim limitations appeared in the same patent." *Clare v. Chrysler Grp., LLC*, 819 F.3d 1323, 1330 (Fed. Cir. 2016). For that reason, this Court has held that "[d]ifferently worded but similar claims in related patents can be construed identically." *Bioverativ*, 2019 WL1276030, at *4. Thus, the Court not only can, but should, construe "alkyl group that is branched" the same as "branched alkyl" in the -335 case. *See Advanced Cardiovascular*, 182 F.App'x at 997; *Bancorp. Servs.*, 359 F.3d at 1373.

**Written Description.** Alnylam does not point to anything in the written description that warrants deviating from the plain meaning and express definitions.

Alnylam's reliance on **Formulas I and II** is misplaced. The patent states that these formulas include compounds with a "branched alkyl," ***not*** an "alkyl group that is branched." (Ex.1,3:66-4:3.) Alnylam argues these terms are "presumed to have

different meanings" when trying to avoid the definition of "branched alkyl" (*supra*,73), yet in the next breath argues that "branched alkyl" examples support its construction of "alkyl group that is branched." Alnylam cannot have it both ways.

Like Formulas I and II, the **exemplary "branched alkyl groups" provided in the definition of "alkyl"** use the term "branched alkyl," not "alkyl group that is branched." (Ex.1,376:21-22.) Moreover, Alnylam is wrong that the "isopropyl" and "sec-butyl" examples show "branched alkyl groups" that have only a secondary carbon. (*Supra*,70.) The skilled artisan would ***only*** refer to those groups as "branched alkyls" if attached to another hydrocarbon group, forming a tertiary carbon. (Ex.45,¶¶90-91; Ex.45D,74.)

Additionally, the patent does not describe **Compound 1** or Alnylam's **Tables 2D and 2E Example** as "branched," much less an "alkyl group that is branched." Alnylam argues that these drawings are nonetheless relevant because they depict examples where the ester is in the —C(O)O— orientation and the alpha carbon is a secondary carbon. Even if true, the Federal Circuit has long rejected the proposition that "each and every claim ought to be interpreted to cover each and every embodiment." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815

F.3d 747, 755 (Fed. Cir. 2016). And there is no suggestion that the term "alkyl group that is branched" was meant to encompass these examples.[25]

**Prosecution History.** In response to a rejection over prior art with a secondary carbon at the α-position, Alnylam amended the claims to add the language "alkyl group that is branched at the α-position." (Ex.52, 2.) Alnylam now illogically argues that the Court should make nothing of Alnylam's amendment but should infer from Alnylam's silence on the added claim language in its written response that the claims must encompass a secondary carbon at the α-position. The law is clear that a patentee's silence during prosecution cannot narrow claim scope, *Grober*, 686 F.3d at 1342, and Alnylam cites no case to suggest the same silence can broaden a claim.

**Expert Testimony.** Despite submitting two declarations, Dr. Scheidt still does not provide opinions on the key issues in dispute. He does not (1) articulate a plain meaning of the disputed term, (2) opine that there is any substantive difference between the terms "alkyl group that is branched" and "branched alkyl," or (3) explain how a skilled artisan would distinguish an alkyl group that is branched from one that is not branched.

[25] Alnylam's caselaw is inapposite. *Ariad* relates to the written description defense, not claim construction. 598 F.3d at 1340. And in *Advanced Steel*, the court relied on drawings that had a clear relation to the disputed term, 808 F.3d at 1317-18, something absent here.

**Alnylam's Construction.** Alnylam's construction leaves the disputed language "alkyl group that is branched" unchanged and thus does not address the parties' dispute. Alnylam suggests that the Court can resolve the dispute by "holding the claims permit a secondary α-carbon at the point of branching" (*supra*,82), but Alnylam's construction says nothing about secondary α-carbons. Really, Alnylam leaves the claim language unchanged because the patent does not support the language that would be required to reflect its requested holding.

### C. "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4"

| Term | Alnylam's Construction | Moderna's Construction |
|---|---|---|
| the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4 | Ordinary and customary meaning, which is "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4" | "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below pH 7.4, and is neutral above pH 7.4, prior to being incorporated in a lipid particle" |

#### 1. Alnylam's Opening Position

The term "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4" needs no construction, as evidenced by the fact that Moderna's supposed construction is nothing more than the words of the claim term repeated verbatim, with additional limitations then read

into it. This is wrong as a matter of law. Further, the additional limitations that Moderna attempts to read in are unsupported by the Patent-in-Suit or the knowledge of a POSA.

As shown below, Moderna's supposed construction is not a construction of any claim term, but rather an attempt to slot in additional limitations that are not present in the claims.

| **Claim Term** | **Moderna's Proposed Construction** |
| --- | --- |
| "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4" | "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below pH 7.4, and is neutral above pH 7.4, prior to being incorporated in a lipid particle" |

The Federal Circuit has "repeatedly rejected" the practice of adding "language without support from the specification or prosecution history, altering otherwise unambiguous claim language." *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (noting that the Federal Circuit has repeatedly rejected the approach of "adding words to the actual claim language" "instead of looking to the words themselves"), citing *McCarty v. Lehigh Val. R.R. Co.*, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim ... we should never know where to stop."); *see also, Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175

F. 3d 985, 989 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").

#### a. The Specification Does Not Support Reading in a Requirement of Neutrality Above pH 7.4

Moderna again takes the unambiguous claim language requiring that the lipid "is positively charged at a pH at or below pH 7.4" and reads in an additional limitation that the lipid "is neutral above pH 7.4."

As an initial matter, the claim language uses the term "comprising" and then requires a "protonatable group such that the lipid compound is positively charged at a pH at or below pH 7.4." The claim language is silent on whether the lipid compound that is positively charged at or below pH 7.4 must also be neutral at all pH values above 7.4. Kros Decl., ¶¶ 77-79. Moderna's narrowing construction reads in a new limitation not found in the claim language and not supported by the written description.

In the written description, the Patent describes protonation as an equilibrium: "[i]t will, of course, be understood that the addition or removal of protons as a function of pH is an equilibrium process, and that the reference to a charged or a neutral lipid refers to the nature of the predominant species and does not require that all of the lipid be present in the charged or neutral form." '479 Patent, 359:33-38. As Dr. Kros explains, there are no bright lines regarding acid-base equilibria – as the

pH changes, the ratio of protonated to unprotonated lipids will change, but it does not occur all at once at a specific pH. Kros Decl., Appendix A.

Moderna will presumably try to support its attempt to read in this limitation with the single sentence in the Patent that states: *"[i]n certain embodiments*, the cationic lipids have at least one protonatable or deprotonatable group, such that the lipid is positively charged at a pH at or below physiological pH (*e.g.* pH 7.4), and neutral at a second pH, *preferably* at *or above physiological pH*." '479 Patent, 359:27-31 (emphasis added); *see* D.I. 48 at 14 (Moderna's inclusion of this reference as intrinsic support in JCCC). That argument should be rejected.

First, this sentence in the Patent begins with "[i]n certain embodiments." The law is clear – it is improper to read in limitations from embodiments. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, *we do not read limitations from the embodiments in the specification into the claims*.") (emphases added). Second, this portion of the written description discusses a second, neutral pH, only in the context of a preferred embodiment within an embodiment, which means it should not be read in to limit the invention as a whole. *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) ("the use of the term 'preferably' makes clear that the language describes a preferred embodiment, not the invention as a whole."). Third, even the preferred embodiment does not require the

lipid be neutral above 7.4, as Moderna seeks in its construction. Rather, it just requires the lipid be neutral at a "second pH . . . at or above physiological pH," which could be any value above 7.4.

**b. Moderna Is Incorrect in Adding a Limitation that the Lipid Compound's Measure of Protonatability be "Prior to Being Incorporated into the LNP"**

The last unsupported limitation that Moderna attempts to read in is that the measure of protonatability of the lipid be made "prior to [the lipid] being incorporated into the LNP." Specifically, Moderna attempts to use this claim term to require that the protonatability analysis take place using what a POSA would call a free lipid compound, that is, the lipid in isolation before it is incorporated into a lipid particle, rather than assessing protonatability in the lipid particle (a/k/a LNP). Kros Decl., ¶42. This is wrong as a matter of law and of science.

As an initial matter, there is nothing in the claim language that requires this temporal limitation. In fact, the claim language is to the contrary. Claim 13 expressly requires the lipid compound be incorporated into a lipid particle: "A method for delivering a nucleic acid comprising administering to a subject a lipid particle comprising a nucleic acid, *a lipid compound*, a neutral lipid, a PEG-lipid, and a sterol, wherein, *the lipid compound*…." A POSA reading the claim understands that the claimed lipids are in the lipid particle and, consistent with customary practice, the relevant pKa is measured after the lipid compound is

incorporated into the lipid particle, contrary to Moderna's construction. Kros Decl., ¶42.

The two independent Claims 1 and 13 referencing pH 7.4 further support this conclusion. The written description defines pH 7.4 as physiological pH and its use in the claim language ties the pH to a biological environment. '479 Patent, 359:27-31. Physiological pH 7.4 is relevant to how lipid compounds are incorporated into lipid particles and used in a functioning lipid particle used to deliver a nucleic acid. It is not relevant to the lipid compound prior to its incorporation into the lipid particle. Kros Decl., ¶42.

Further, as a matter of science, and as described in the Kros Declaration, the written description of the Patent-in-Suit, together with the knowledge of a POSA, makes clear that, as used in the Patent-in-Suit, the references to pKa and protonatability are in terms of physiological pH and are directed at the "lipid compound" being incorporated into the "lipid particle" (a/k/a LNP), and not prior to its incorporation, as Moderna seeks to limit the claim. Kros Decl., ¶42; '479 Patent, 16:43-52, 16:61-18:40. The specification further incorporates by reference multiple patent applications confirming the ordinary and customary practice of using the pKa in the context of the lipid compound incorporated into the lipid particle, as measured by the standard TNS binding assay technique. '479 Patent, 374:59-67; Kros Decl., ¶43; Ex. 13 (Heyes, 2005); *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348,

1366 (Fed. Cir. 2012) ("a document incorporated by reference [into a patent] becomes effectively part of the host document as if it were explicitly contained therein") (citations omitted); *see also Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018) ("a specification need not disclose what is well known in the art.") (quotations omitted). For the foregoing reasons, Moderna's attempt to limit the claims should be rejected.

**2. Moderna's Answering Position**

Moderna's construction of "the lipid compound contains a protonatable group such that the lipid compound is positively charged at a pH at or below 7.4" does not "read-in" limitations. Instead, it clearly explains for the jury what the claim language implicitly requires and the written description mandates. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) ("The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.").

Alnylam's contrary approach is to explain nothing, leaving the parties' dispute unresolved, contrary to Federal Circuit precedent. Alnylam argues that the term "needs no construction," but its own brief shows the folly of that position. Alnylam, for instance, asserts that the claims require assessment of the charge of the lipid compound ***in a lipid particle*** but neither the claims, nor Alnylam's construction, say

any such thing. Its non-construction also renders the language "at or above pH 7.4" superfluous, again contrary to established cannons of claim construction.

Moderna's construction is consistent with the intrinsic evidence and Federal Circuit law, aids the jury in understanding the claim term, and should be adopted.

#### a. The Lipid Compound Must Be Neutral Above pH 7.4

**The Claim Language.** The claim language dictates that the lipid compound must be neutral above pH 7.4. It is well-established that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed. Cir. 2014) (citing *Merck & Co. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005)). "It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017). Alnylam's construction renders the language "at or below pH 7.4" superfluous and thus cannot be correct.

A lipid compound with a "protonatable group" (an "ionizable lipid") is "neutral at certain pHs and protonated (i.e., positively charged) at other, lower pHs." (Ex. 2, ¶40.) An ionizable lipid becomes positively charged when its protonatable group accepts a proton (*i.e.*, a positively charged hydrogen atom). (Ex.2, ¶20.) The amount of a given ionizable lipid that is positively charged depends on the characteristics of the lipid and pH of the solution. (Ex.2, ¶77.) Importantly, for all

ionizable lipids, as a solution gets more acidic (the pH goes down), the amount of positively charged lipid goes up.[26] (*Id.*) At very low pHs, even lipids that are not highly protonatable will be protonated.

For that reason, Alnylam's construction (or lack thereof) effectively reads the language "at or below pH 7.4" out of the claims. For instance, a lipid compound that becomes positively charged at pH 14 (the highest value on the pH scale), will necessarily be positively charged at a lower pH, such as "at or below pH 7.4," because the amount of positively charged lipid goes up as the pH goes down. (Ex.35, 105-108.) Likewise, a lipid compound that becomes positively charged a pH 1 (the lowest value on the pH scale), would be positively charged at or ***below*** pH 7.4. (*Id.*) The same is true of any lipid that becomes positively charged at ***any pH*** between pH 1 and pH 14. (*Id.*)

Alnylam's construction thus reads the claim term to cover any lipid compound that is positively charged ***at any pH***. In other words, under Alnylam's construction, one could change "pH 7.4" in the claim language to ***any other pH***, and the scope of the claim would not change. That makes the language "at or below pH 7.4" superfluous, contrary to Federal Circuit precedent. *See Aspex Eyewear, Inc. v.*

---

[26] As the patent explains, "the reference to a charged or a neutral lipid refers to the nature of the ***predominant species*** and does not require that all of the lipid be present in the charged or neutral form." ('479 patent, 359:33-38.) Thus, Moderna's construction refers to the predominant species of the lipid compound.

*Marchon Eyewerar, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (reversing district court's claim construction construing the term "rearwardly directed free end" to mean "rearwardly directed end portion" because such a construction "effectively read [ ] the term 'free' out of the limitation").

Moderna's construction, in contrast, gives meaning to all the claim language. It makes explicit that the lipid is neutral above pH 7.4 and only ***becomes*** positively charged at a pH at or below pH 7.4. Thus, under Moderna's construction, the patentees' chosen pH (7.4) does some work in the claim by designating the pHs at which the lipid compound can and cannot be positively charged. Moderna's construction also comports with the plain meaning of a lipid compound with a "protonatable group," which Alnylam's expert concedes are "neutral at certain pHs." (Ex.2, ¶40.)

**The Written Description.** Consistent with Alnylam's expert testimony, the written description dictates that lipids with a "protonatable group" must be neutral at a certain pH. For instance, the written description provides that "[i]n certain embodiments, the cationic lipids have at least one protonatable or deprotonatable group, such that the lipid is ***positively charged at a pH*** at or below physiological pH (e.g., pH 7.4), and ***neutral at a second pH***, preferably at or above physiological pH." ('479 patent, 359:28-32.) Moderna's construction embraces that teaching, requiring the lipid to be neutral above pH 7.4, the only pH referenced in the claims.

Alnylam's arguments to the contrary completely miss the point. Moderna is not asking the Court to read in a limitation based on the example in Column 359. (*Supra*, 91.) Instead, Moderna's construction implements what both the written description and Alnylam's expert admit: that a lipid compound with a protonatable group must be neutral above a particular pH. The only pH that the claim language provides is pH 7.4. Alnylam's construction, in contrast, ignores this teaching and does not require the lipid compound to be neutral at any particular pH, nullifying the pH requirement entirely.

#### b. The Lipid Compound, not the Lipid Particle, Must Be Positively Charged at a pH at or below pH 7.4

**The Claim Language.** The claim language unequivocally states that "the lipid compound" is positively charged at a pH at or below pH 7.4. ('479 patent, 503:19-21.) Nowhere do the claims suggest assessing the charge of the lipid particle, as Alnylam suggests. Indeed, asserted claims 1-9 make no mention whatsoever of a lipid particle. (*Id*. at 503:2-49.)

The claims also explicitly distinguish between a "lipid compound" and a "lipid particle." Claim 13 recites a method of delivering a "lipid particle" that includes the "lipid compound" of claim 1. ('479 patent, 504:4-27.) Yet, like the other claims, claim 13 still requires that the "lipid compound," not the lipid particle, is positively charged at or below pH 7.4. ('479 patent, 504:4-27.) Those different terms are presumed to have different meanings. *See Karlin Tech. Inc. v. Surgical*

*Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999) ("different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope").

Alnylam incorrectly argues that the claim must refer to the charge of the lipid in a lipid particle because the claimed pH (7.4) is only relevant in the human body. But under Alnylam's read of the claim, as explained above, that pH is essentially meaningless because any lipid with a protonatable group would be positively charged at a pH at or below pH 7.4. Putting that aside, pH 7.4 may be relevant to both "free" lipids and lipid particles alike. For instance, after a lipid particle reaches its destination in the body and releases its drug payload, the lipid particle degrades and free lipids may circulate in the blood, making their charge around pH 7.4 relevant.

**The Written Description.** The written description also differentiates between the charge of lipids, on one hand, and lipid particles, on the other.

For instance, the patent provides that, in certain embodiments, "***protonatable lipids*** . . . have a pKa of the protonatable group in the range of about 4 to about 11."[27] ('479 patent, 359:40-42.) The next sentence provides examples where "the lipids can have a pKa of about 4 to about 7 . . . ***when incorporated into a lipid particle***." (*Id.*,

[27] Again, pKa is the approximate pH at which the predominant species of a protonatable molecule become positively charged. (Ex.11, 18)

359:42-45.) The sentence after that states that "[s]uch ***lipids*** may be cationic at a lower pH formulation stage, ***while particles*** will be largely (though not completely) surface neutralized at physiological pH around pH 7.4. (*Id.*, 359:45-48.) This paragraph makes clear that the patentees knew how to differentiate between the pKa or protonatability of a "lipid," on one hand, and a lipid "incorporated in a lipid particle" or a "particle," on the other hand. Yet, in the claims, the patentees required assessment of the "lipid compound" charge, not the "lipid particle" charge.

Similarly, other parts of the written description discuss protonatability as an inherent property of the lipid compound itself, with no mention of a lipid particle. ('479 patent, 32:21-27 ("The *pKa* can be influenced by the structure of the lipid, particularly the nature of head group; e.g., the presence, absence, and location of functional groups such as . . . ").

Yet, Alnylam and its expert incorrectly argue that the written description "references to pKa and protonatability are in terms of physiological pH" and "are directed at the 'lipid compound' being incorporated into the 'lipid particle.'" (*Supra*, III.C.1.b.) To the contrary, the patent identifies a number pKa ranges far from physiological pH. For instance, the written description provides that the lipid can have "a pKa of the protonatable group of about 4 to about 11." ('479 patent, 359:40-42.) Elsewhere, the written description describes a "protonatable group having a pKa of [] about 4 to about 13…" (*Id.*, 16:48-49.) pKas in the range of 8-13, as

contemplated by those sections of the written description, are consistent with the pKa of a "free" lipid with a tertiary amine, not one in a lipid particle. (Ex.56, 3.)

The applications incorporated by reference in the '479 patent do not change the result. The written description cites these applications to show "methods of making cationic lipids" and "lipid particles containing them," not for assessing the pH at which the lipids become positively charged. ('479 patent, 59-67.) And, to the extent they are relevant at all, these applications support Moderna. Like the written description of the '479 patent, those applications clearly differentiate between the protonatability of the lipid and the lipid particle. (Ex.29, 52.) For instance, WO2010/054406 provides that "***lipids*** will be cationic at a lower pH formulation stage, ***while particles*** will be largely (though not completely) surface neutralized at physiological pH around pH 7.4." (Ex.29, 52.) It then goes on to provide methods for "pKa measurements of lipids within lipid particles" (*id.*), something the patent claims here do not. Finally, when discussing the results of its pKa measurements, WO2010/054406 describes them as reflecting the "pKa of the cationic lipid-***containing vesicles***," not the lipid compound itself, as recited in the claim language. (Ex.29, 246.)

**Alnylam's Construction.** Alnylam says that no construction is needed but then proceeds to argue that "[a] POSA reading the claim understands that the claimed lipids ***are in the lipid particle***." (*Supra*, 92-93.) The problem is that the claim term

says no such thing, and Alnylam's proposed construction does not resolve the parties' dispute. *See O2 Micro Int'l, Ltd.*, 521 F.3d at 1362 (Fed. Cir. 2008). Alnylam's construction should be rejected.

**3. Alnylam's Reply Position**

Moderna's construction is nothing more than a litigation inspired wish list to create a non-infringement position, which is evident from Moderna's responsive position. Moderna attempts to hide the fact that Alnylam's construction is the literal words of the claim, whereas Moderna's construction only adds un-needed words to the claim. This is transparently nothing more than improperly reading in limitations. Further, Moderna does not address the Alnylam's arguments, and instead misapplies case law.

**a. Neither the Claims nor the Written Description Require Neutrality Above pH 7.4**

Alnylam is not, as Moderna suggests, leaving out any portion of the claim language – because Alnylam's ordinary and customary construction is simply the entirety of the claim language. Instead, it is Moderna that is attempting to read in limitations. In doing so, Moderna misapplies the case law and distorts the statements of Alnylam's expert.

The case law that Moderna cites to support its flawed reading of the claim language is distinguishable from the issues here. In *Vederi*, the district court erred by ignoring the word "substantially" in the claim language. *Vederi*, 744 F.3d at

1384. As Alnylam's construction embraces all the words of the claim term, *Vederi* is not applicable. Similarly, Moderna's reliance on *Aspex Eyewear* is equally inapt because in *Aspex Eyewear* the district court erred by omitting words of the claim term, which Alnylam is not urging. *Aspex Eyewear*, 672 F.3d at 1348. In *Wasica*, the PTAB erred by entering a construction that would negate other claim language. *See Wasica*, 853 F.3d at 1288 (holding that a construction requiring "two or more bits" was incorrect because it would negate claim language that allowed for single bit sequences). By contrast, Alnylam's construction (the claim language itself) only requires a positive charge below pH 7.4. It does not require neutrality above pH 7.4 or otherwise negate any other claim language.

Moderna completely mischaracterizes Dr. Kros's position. Dr. Kros does not "admit" that the claim requires the lipid to be neutral above pH 7.4. Moderna Brief at 98. Instead, Dr. Kros clearly explained that the written description does not support Moderna's attempt to read in a limitation regarding neutrality above pH 7.4. Kros Decl., ¶¶77-79.

Moderna chastises Alnylam for suggesting that Moderna is attempting to read in embodiments, and yet it relies on a single specification cite that begins with "[i]n certain embodiments" as its only written description support for its overly narrow construction. As discussed above, this is incorrect as a matter of law. *Supra* 91-92. Additionally, Moderna's arguments for its overly restrictive claim construction

ignore a key aspect of the asserted claims – they are open, "comprising" claims, and not closed "consisting of" claims. Moderna fails to address this key aspect of the claim language.

### b. Moderna Is Incorrectly Reading in the Requirement that the Protonatability Must Be Measured for the Free Lipid

Moderna's entire argument disregards a key cannon of claim construction – the claims must be read from the point of view of a POSA. *Phillips*, 415 F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."). Where, as here, the Court is interpreting terms of specific meanings in a particular field, a court should look to experts to clarify these issues. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) ("In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.").

Dr. Kros's expert testimony explains that the only relevant pKa in the context of lipid particles for the delivery of nucleic acids is the pKa of the lipid compound when it is incorporated into a lipid particle. *See* Kros Decl., ¶80. Moderna has offered nothing to contradict this clear position. Moderna also provides no expert support for its incorrect interpretation of the written description.

Further, Moderna's argument based on the written description misconstrues the text of the Patent-in-Suit. Specifically, Moderna omits the full context of the statements in column 359 – presumably because the full sentences do not support Moderna's construction. Moderna's briefing states:

> For instance, the patent provides that, in certain embodiments, "***protonatable lipids*** . . . have a pKa of the protonatable group in the range of about 4 to about 11." ('479 patent, 359:40-42.) The next sentence provides examples where "the lipids can have a pKa of about 4 to about 7 . . . ***when incorporated into a lipid particle***." (*Id.*, 359:42-45.) The sentence after that states that "[s]uch ***lipids*** may be cationic at a lower pH formulation stage, ***while particles*** will be largely (though not completely) surface neutralized at physiological pH around pH 7.4. (*Id.*, 359:45-48.)

Moderna Response at 99-100. The full language, without Moderna's ellipses, makes clear that there may be successively narrowing ranges for the pKa in preferred embodiments. '479 Patent at 359:40-45. It is not, as Moderna suggests, that the 4 to 11 range is to be understood as separate from the other, narrower ranges. Rather, it is a broad range followed by narrower and narrower example ranges, as is commonly done it patent drafting. All of the referenced pKa values are understood by POSA as the pKa for the lipid when incorporated into the lipid particle. Kros Decl., ¶¶80-84.

Moderna's other arguments also fail. First Moderna's argument regarding the use of "lipid particle" in Claim 13 fundamentally misstates Alnylam's argument.[28] Alnylam is not suggesting that the claim language refers to the pKa of the lipid particle as whole. Rather, Alnylam is arguing that a POSA would understand the relevant pKa for the lipid compound to be the pKa of the lipid compound when it is incorporated into the lipid particle. Kros Decl., ¶¶80-84. Second, Moderna's suggestion that Alnylam's construction runs afoul of *O2 Micro* is incorrect. This Court can easily resolve the dispute between the parties regarding this claim term by rejecting Moderna's improper language that contradicts uncontroverted expert testimony regarding the meaning of the claim term.

### 4. Moderna's Sur-Reply Position

**Neutral above pH 7.4.** Alnylam does not disagree that its construction renders the language "at or below pH 7.4" meaningless. Alnylam, for instance, does not contest that lipids with a protonatable group must be neutral above a certain pH and positively charged below that pH.[29] (*Supra*,95-96.) Nor does Alnylam disagree that a lipid that becomes positively charged at a particular pH will remain positively

[28] Alnylam does not read Moderna's argument to suggest that the term Moderna selected for construction, which appears in both claims 1 and 13, should be construed definitely between the two claim terms.

[29] Moderna did not "mischaracterize[] Dr. Kros's opinion." (*Supra*,103.) As Moderna said, Dr. Kros conceded that lipids with protonatable groups are "neutral at certain pHs and protonated (i.e., positively charged) at other, lower, pHs." (*Supra*,95,96,98; Ex.2,¶40.)

charged at lower pHs. (*Id.*) As a result, Alnylam cannot and does not disagree that a lipid compound that is positively charged at pH 14 (the highest pH), pH 1 (the lowest pH), or any pH in between would be positively charged "at or below pH 7.4." (*Id.*) Alnylam's construction thus covers lipid compounds that are positively charged ***at any pH***, making "at or below pH 7.4" meaningless.

Alnylam instead argues that its construction cannot legally render "at or below pH 7.4" meaningless because those literal words appear in its construction. But Alnylam does not cite a single case to support that proposition. Nor does Alnylam dispute that "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Wasica*, 853 F.3d at 1288 n.10. Alnylam's construction does just that by rendering "at or below pH 7.4" meaningless. Moderna's construction, in contrast, gives meaning to all the claim language by requiring that the lipid compound is neutral above pH 7.4.

**Prior to Being Incorporated in a Lipid Particle.** Alnylam attempts to elevate unsupported expert testimony over the intrinsic record. But the intrinsic record here is clear.

The claim language provides that "the lipid compound" is positively charged at certain pHs. (Ex.1,503:19-21.) The claim language does not suggest assessing the charge of the "lipid particle" or the lipid compound "when incorporated in a lipid particle," and Alnylam does not argue otherwise in reply.

Moreover, the written description shows that the patentees knew the exact language to use when referring to the charge of a lipid "incorporated in a lipid particle" (*supra*,99-100), but they chose not to do so in the claims. Alnylam argues that a skilled artisan would understand ***every reference*** to charge in the patent to be for the lipid "when incorporated into the lipid particle" but that argument contradicts the written description's plain language, which differentiates between the charge of the lipid itself and a lipid particle. (Ex.1,359:42-45 (referring to charge of a lipid "when incorporated into lipid particles"), 359:45-48 ("Such ***lipids*** may be cationic at a lower pH formulation stage, ***while particles*** will be largely (though not completely) surface neutralized at physiological pH around pH 7.4.")

Alnylam also does not dispute that other sections of the written description show the patentees considered the charge of the "free" lipid relevant to the purported invention. For example, Alnylam does not dispute that the written description:

- References a wide range of pKas not relevant to the charge of a lipid particle in the body. (*Supra*,100-101.)
- Discusses protonatability as an inherent property of the lipid itself, independent from the lipid particle. (*Supra*,100.)
- Incorporates by reference patent applications that differentiate between the protonatability of a "free" lipid and a lipid particle (or lipid incorporated in a lipid particle). (*Supra*,101; Ex.29.)

Alnylam's only response to the intrinsic evidence is unsupported expert testimony. (*Supra*,104.) That testimony cannot overcome the plain language of the claims or the clear evidence in the written description. *See Sequoia*, 66 F.4th at 1324.

Finally, as to its own construction, Alnylam states that it is "arguing that a POSA would understand the relevant pKa [is] of the lipid compound ***when it is incorporated into the lipid particle***." (*Supra*,106.) But Alnylam's construction does not say that. And Alnylam does not cite any case to support its argument that the Court can resolve the parties dispute by rejecting Moderna's proposed construction and adopting a competing construction that is silent on the parties' dispute. In truth, Alnylam does not propose a true competing construction to hide that it, not Moderna, seeks to read in limitations.

Respectfully submitted,

MCDERMOTT WILL & EMERY LLP

*/s/ Ethan H. Townsend*

Ethan H. Townsend (#5813)
The Brandywine Building,
1000 N. West Street, Suite 1400
Wilmington, DE 19801
(302) 485-3911
ehtownsend@mwe.com

OF COUNSEL:

William G. Gaede, III
Anisa Noorassa
MCDERMOTT WILL & EMERY LLP
415 Mission Street, Suite 5600

FARNAN LLP

*/s/ Michael J. Farnan*

Brian E. Farnan (#4089)
Michael J. Farnan (#5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

OF COUNSEL:

Elizabeth M. Flanagan
Brianna Patterson

San Francisco, CA 94105
(650) 815-7400

Sarah Chapin Columbia
Sarah J. Fischer
McDermott Will & Emery LLP
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
(617) 535-4000

Ian B. Brooks
Timothy Dunker
McDermott Will & Emery LLP
500 N. Capitol Street NW
Washington, DC 20003
(202) 756-8000

Bhanu K. Sadasivan
McDermott Will & Emery LLP
650 Live Oak Ave., Suite 300
Menlo Park, CA 94025-4885
(650) 815-7537

Mandy H. Kim
McDermott Will & Emery LLP
18585 Jamboree Road, Suite 250
Irvine, CA 92612-2565
(949) 757-6061

*Attorneys for Plaintiff*
*Alnylam Pharmaceuticals, Inc.*

Cooley LLP
30 South 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383

W. Chad Shear
Geoffrey D. Biegler
Cooley LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 490-6000

Elizabeth L. Stameshkin
Angela Madrigal
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Naina Soni
Dean Fanelli
Brittany Cazakoff
Cooley LLP
1299 Pennsylvania Ave. N.W.,
Suite 700
Washington D.C. 20004
(202) 842-7800

*Attorneys for Defendants*
*Moderna, Inc., Moderna TX, Inc., and*
*Moderna US, Inc.*

Dated: June 12, 2024

## WORD COUNT CERTIFICATION

Pursuant to Paragraph 16 of the October 2, 2023, Scheduling Order (Dkt. 28), the undersigned counsel hereby certifies that Plaintiff's foregoing opening and reply briefs contain 5,339 and 5,492 words respectively, and Defendants' answering and sur-reply briefs contain 8,162 and 2,739 words respectively, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.

*<u>/s/ Ethan H. Townsend</u>*
Ethan H. Townsend (#5813)

**CERTIFICATION OF SERVICE**

The undersigned counsel certifies that a true and correct copy of the foregoing document was served on June 12, 2024 on the following counsel via EMAIL.

Brian E. Farnan
Michael J. Farnan
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Elizabeth M. Flanagan
Brianna Lee Chamberlin
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@cooley.com
bchamberlin@cooley.com

Dean Fanelli
Naina Soni
Brittany Cazakoff
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
dfanelli@cooley.com
nsoni@cooley.com
bcazakoff@cooley.com

W. Chad Shear
Geoffrey D. Biegler
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 490-6000
cshear@cooley.com
gbiegler@cooley.com

Elizabeth L. Stameshkin
Angela Madrigal
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
lstameshkin@cooley.com
amadrigal@cooley.com

*Attorneys for Defendants,*
*MODERNA, INC., MODERNA TX, INC., and MODERNA US, INC.*

*/s/ Ethan H. Townsend*
Ethan H. Townsend (#5813)